**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Michael MUSTREAD, Defendant–Appellant.**

**No. 93–1456.**

United States Court of Appeals, Seventh Circuit.

Argued May 10, 1994.

Decided Dec. 19, 1994.

Colin S. Bruce, Asst. U.S. Atty., Springfield, IL (argued), for plaintiff-appellee.

William D. Reid, Elmore & Reid, Springfield, IL (argued), for defendant-appellant.

Before ESCHBACH, EASTERBROOK, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Michael Mustread once had a promising future. He had received an undergraduate degree with honors, and he had been admitted to law school. But Mustread decided that before attending law school, he would distribute marijuana on a vast scale. The jury convicted him of conspiracy to distribute marijuana, possession of marijuana with intent to distribute, and money laundering. The judge sentenced him to 360 months in prison. Mustread now appeals his conviction and sentence on numerous grounds. We affirm Mustread's conviction, but vacate his sentence and remand for resentencing.

## BACKGROUND

Charles Mustread, Michael Mustread's father, lived near Peoria, Illinois; he had dealt marijuana in the area for some time before the summer of 1989. He did not buy simply for personal use; he bought large quantities for distribution. Charles Mustread bought his marijuana mainly from John McGinnis, who sold marijuana in central Illinois.

In the summer of 1989, Charles Mustread became dissatisfied with the price and reliability of supply of the marijuana McGinnis sold. He decided to buy instead from William Moak, an associate of McGinnis. Around this time Michael Mustread joined his father's criminal activity, immediately becoming actively involved. To lay the groundwork for a future relationship with Moak, Michael flew to Phoenix, Arizona in July 1989, where he met with Moak. Later that same month, the Mustreads drove together to Tucson, Arizona, where they met Moak and John Merrick, who transported marijuana for Moak. The Mustreads bought about 50 pounds of marijuana and took it back to Illinois.

In the following months, Michael Mustread engaged in large-scale marijuana buying, transport and distribution. In November 1989 he took over the business entirely from his father, who had fallen ill. Mustread drove cross-country several times, bought marijuana, and carried it back to Illinois. As the amounts he bought increased, he expanded his operation. Instead of a passenger car, he began to use a pick-up truck, which carried more cargo. And instead of buying exclusively from Moak, Mustread began to buy directly from one of Moak's suppliers, Arnold Figueroa, who in turn was supplied by Victor Rojas. Mustread additionally bought marijuana directly from Rojas. Moak was also supplied by Jorge Tavizon, from whom it does not appear Mustread bought directly, but with whom Mustread cooperated.

Michael Mustread always transported his own marijuana back to Illinois from Arizona. Sometimes, when travelling cross-country, he would also transport marijuana for Moak to Ohio, Moak's home base, a service for which Moak paid Mustread. Merrick, however, was Moak's primary "mule": he transported the majority of Moak's marijuana back to the Midwest from Arizona. Once, in December 1989, Mustread asked Merrick to transport a load of Mustread's marijuana because he had gotten sick in Arizona and could not do it himself. Merrick asked Moak's permission to transport for Mustread, which Moak granted, but ultimately that transportation fell through.

Moak, Mustread, Figueroa, Tavizon, and Merrick all worked closely together. Merrick acted strictly as a mule; he did not distribute marijuana himself. The others all distributed marijuana: Mustread in Illinois, Moak in Ohio, Figueroa and Tavizon elsewhere. The activity got so large that Tavizon rented a house, the "Arizona House," in Tucson in October 1989. They all used the Arizona House to receive, store, process, and re-package marijuana, breaking it down from bales into smaller containers. Moak gave a set of keys to Merrick, so that Merrick could more easily fulfil his job of transporting Moak's marijuana. In November the Mustreads jointly subleased the house from Tavi-

zon, and Charles Mustread, whose health was poor and who was apparently declining rapidly, moved in for the winter. Tavizon continued to pay the electric and trash collection bills.

Mustread's marijuana trafficking lasted barely six months. The conspiracy began to unravel when Moak was arrested by agents of the Drug Enforcement Administration on December 5. He was carrying more than pocket money: the DEA seized over a million dollars from him. Moak promptly cooperated with the authorities and helped the DEA amass evidence against his co-conspirators. The DEA taped several telephone conversations between Moak and Mustread in which they discussed their business. On December 20, the DEA stopped Mustread at the Tucson airport, where they seized $65,-000 found on him, but did not arrest him. On December 27, Figueroa, Merrick, and Rojas were arrested. In early January, Mustread moved out of the Arizona House, leaving it empty. Soon thereafter the DEA searched the Arizona House, finding traces of marijuana and other evidence of marijuana trafficking.

On March 4, Illinois police arrested Mustread. They had gone to his father's cabin in Bath, Illinois, where Michael Mustread was living. He was not at home, but his father was, and he refused to let in the police. After glimpsing bales of marijuana in the cabin, however, the police obtained a search warrant and searched the cabin. They found and seized large amounts of baled marijuana, electronic scales, boxes filled with marijuana (with vacuum seals designed to foil drug-sniffing dogs), and much cash. The Illinois police arrested Michael Mustread that same day on his way to his father's cabin. At Mustread's trial, Moak, Merrick, and Figueroa all testified against him.[1]

## ANALYSIS

*1. Accuracy of the Quantity of Marijuana and Money Involved*

■ At sentencing, the trial judge found that Mustread was directly responsible for

the distribution of 2,610 pounds of marijuana. The judge also found that the amount of money connected to the money laundering offense was $328,400. The judge calculated Mustread's sentence under the Sentencing Guidelines based on those amounts. Mustread argues that the evidence does not adequately support those amounts of marijuana and money.

Before passing sentence, the trial judge received a detailed pre-sentence report (PSR) from a probation officer. Mustread objected in writing to numerous parts of the PSR. In response, the trial judge made oral and written findings on each objection, rejected them all, and wholly adopted the PSR, finding it accurate. The finding of 2,610 pounds of marijuana was based on several sources, including trial testimony and statements of both Moak and Figueroa, Mustread's written record of marijuana transactions, and the marijuana seized at Charles Mustread's house. Mustread argues that this drug quantity evidence was inaccurate.

■ It is entirely true, as Mustread argues, that a defendant has a due process right to be sentenced on the basis of accurate information. *United States v. Tucker*, 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972); *United States v. Isirov*, 986 F.2d 183, 185 (7th Cir.1993). Therefore, drug quantities used at sentencing must be accurate. To ensure that necessary accuracy, a sentencing court must make a specific finding of drug quantity and state the basis for that finding. *United States v. Leichtnam*, 948 F.2d 370, 382 (7th Cir.1991). The trial judge met this requirement with his explicit findings based on the PSR. We review deferentially the trial court's factual determination of drug amounts; only if clear error has been committed will we vacate a defendant's sentence. *United States v. Montgomery*, 990 F.2d 266, 269 (7th Cir.1993).

■ Generally, where a court relies on a PSR in sentencing, it is the defendant's task

to show the trial judge that the facts contained in the PSR are inaccurate. *United States v. Coonce*, 961 F.2d 1268, 1280–81 (7th Cir.1992). A defendant cannot show that a PSR is inaccurate by simply denying the PSR's truth. Instead, beyond such a "bare denial," he must produce some evidence that "calls the reliability or correctness of the alleged facts into question." *Isirov*, 986 F.2d at 186. If a defendant meets this burden of production, the government must then convince the court that the PSR's facts are actually true. *Coonce*, 961 F.2d at 1280. But the defendant gets no free ride: he must produce more than a bare denial, or the judge may rely entirely on the PSR.

■ In some instances, however, the defendant may escape his burden of producing some evidence to contradict the PSR. This can occur when the PSR contains nothing but a "naked or unsupported charge." *Isirov*, 986 F.2d at 186 n. 1; *Coonce*, 961 F.2d at 1279. That is because in response to a bare assertion by the PSR, a bare denial from the defendant may suffice to suggest inaccuracy.

Mustread stridently argues that the facts in the PSR were simply "unsupported charges" that were backed by no real evidence, and thus he should have been absolved of the necessity of producing evidence to counter the PSR. However, the record shows the lack of persuasiveness of Mustread's argument.

Of the total 2,610 pounds attributed to Mustread, 1,100 pounds was marijuana he transported for Moak from Arizona to Ohio. Both Moak's trial testimony and statements to probation office investigators amply supported that figure. The PSR further stated, again based on Moak's trial testimony and statements to investigators, that Mustread bought approximately 800 pounds of marijuana in Moak's presence. Mustread argues that figure was inconsistent with Moak's trial testimony and that thus the trial judge erred by not making findings as to which of the two figures was correct. *See United States v. Duarte*, 950 F.2d 1255, 1266 (7th Cir.1991), *cert. denied*, — U.S. —, 113 S.Ct. 174, 121 L.Ed.2d 120 (1992) (holding that in sentencing the trial judge must resolve a witness'

inconsistent testimony about drug quantity). We, however, see no inconsistency here.

Admittedly, Moak's trial testimony about the quantity of marijuana was not precise. He stated that Charles and Michael Mustread bought marijuana in his presence between ten and twenty times, each time buying somewhere between 50 and 150 pounds. But that testimony does not contradict the PSR. Moak's trial testimony covered a range between 500 and 3000 pounds. The 800 pound figure falls well within that range; in fact, it is at the extreme low end of the range. Mustread failed to produce any evidence suggesting that the PSR's use of the more precise 800 pound figure was incorrect. Under *Coonce*, the trial court did not commit any error in accepting the PSR's figure. *See United States v. Westbrook*, 986 F.2d 180, 183 (7th Cir.1993) (finding no error where PSR figure for drug quantity fell within the range of earlier estimates of drug quantity given by the witness).

Mustread also failed to counter the PSR's statement that $328,400 was properly considered part of the money laundering activity. Moak testified at trial that he and Mustread had once together transported $250,000 across the country to buy marijuana. The DEA seized $65,000 in drug proceeds from Mustread at the Tucson airport, and the police found more money at the time of Mustread's arrest and the search of his residence. The trial judge found the PSR's calculations of money accurate. We see no error in that determination.

Mustread produced no evidence attacking any part of the PSR's calculations of the quantity of marijuana or money. The trial judge even directed Mustread's attention to *Coonce* and told him about his obligations under the law of this Circuit, inviting him to produce contrary evidence and informing him of the consequences if he did not. Mustread simply again repeated his bare denial of the PSR. The trial judge thus not only committed no error in adopting the PSR's calculations, but also demonstrated a complete grasp of recent Circuit law.

*2. Section 3B1.1(a) Sentence Adjustment as an Organizer or Leader*

■ The trial judge gave Mustread a four-level sentence increase for being an "organizer or leader" of a large criminal organization. Mustread contends that this adjustment was erroneous. We agree.

■ Sentencing Guidelines § 3B1.1 provides a range of increases in offense level for defendants found to have played an aggravated role in a criminal activity. Section 3B1.1's core focus is relative responsibility: "[T]hose who play an aggravating role in the offense are to receive sentences that reflect their greater contributions to the illegal scheme." *United States v. Brown*, 944 F.2d 1377, 1381 (7th Cir.1991). Therefore, a defendant who had no greater role than any other participant cannot receive a § 3B1.1 increase. *Brown*, 944 F.2d at 1381–82; *see also United States v. Skinner*, 986 F.2d 1091, 1099 (7th Cir.1993) (noting that no § 3B1.1 adjustment may be imposed where a defendant was not relatively more responsible than other participants).

■ To receive any § 3B1.1 increase, a defendant "must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1, commentary n. 2. *See also United States v. DiCicco*, 899 F.2d 1531, 1535 (7th Cir.1990) (holding the same).[2] Thus, at a minimum, a defendant must have had some real and direct influence, aimed at furthering the criminal activity, upon one other identified participant. "Section 3B1.1 requires the exercise of some authority in the organization, the exertion of some degree of control, influence, or leadership." *Brown*, 944 F.2d at 1385.

Section 3B1.1 adjustments vary both according to the defendant's degree of responsibility and according to the size of the criminal activity. Section 3B1.1(a) gives a four-level increase to a defendant who was an "organizer or leader" of a large-scale criminal activity. The trial judge gave Mustread this adjustment. Section 3B1.1(b) gives a

three-level increase to a defendant who held the lesser role of "manager or supervisor" of a large-scale criminal activity. Finally, Section 3B1.1(c) gives a two-level increase to a defendant who was an "organizer, leader, manager or supervisor" in any criminal activity that was not large-scale.

A criminal activity is large enough to trigger § 3B1.1(a) or (b) if it "involved five or more participants or was otherwise extensive." A "participant" is any person criminally responsible for an offense, whether or not he was convicted. *United States v. Cantero*, 995 F.2d 1407, 1414 (7th Cir.1993); U.S.S.G. § 3B1.1, commentary n. 1. The trial judge found correctly that Mustread's criminal activity was large-scale because it involved more than five participants. The trial judge also found that the criminal activity was "otherwise extensive." Thus, Mustread could receive an increase under § 3B1.1(a) or (b), but not under § 3B1.1(c).

■ We review the trial judge's determination of a defendant's role in an offense for clear error. *United States v. Goines*, 988 F.2d 750, 777 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 241, 126 L.Ed.2d 195 (1993). We will affirm Mustread's sentence unless, after reviewing all the evidence, we are left with the "definite and firm conviction that a mistake has been committed." *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989).

The trial judge laid out on the record his reasoning for imposing a four-level sentence increase on Mustread under § 3B1.1(a). The judge, adopting the language and finding of the pre-sentence report (PSR), reasoned that Mustread "was at the top of a drug distribution network." The adopted PSR also alleged that the increase was warranted because Mustread "exercised total decision making authority over his marijuana purchases." The trial judge concluded that therefore § 3B1.1 mandated a sentence adjustment. However, we do not think that the

---

**2.** We realize, of course, that the quoted Sentencing Guidelines commentary was added after *DeCecco*. *See* U.S.S.G., App. C at 403–04. The addition to the commentary resolved a split of authority on whether a participant who only controlled property or other physical infrastructure could receive a § 3B1.1 enhancement. *Id. DeCicco's* holding supports and agrees with the later Guidelines commentary.

given reasons are adequate to support a § 3B1.1 increase.

■ Mustread did distribute marijuana to others, marijuana destined for retail sale. But by itself, being a distributor, even a large distributor like Mustread, is not enough to support a § 3B1.1 offense level increase. *Brown*, 944 F.2d at 1381. Rather, if he was a distributor, the defendant must also have been an organizer, leader, manager or supervisor of those to whom he distributed. If the record does not show that he had that status, if the defendant maintained no real guiding influence or authority over the purchasers, a § 3B1.1 adjustment is inappropriate. *Id.* And the record does not show that Mustread had influence or authority over anybody to whom he distributed.

Similarly, that Mustread "exercised total decision making authority over his marijuana purchases" cannot, by itself, support the conclusion that Mustread played an aggravated role. One can make decisions for oneself without having authority or influence over others. The trial judge's reasoning does support the conclusion that Mustread committed the crimes of which he was convicted, but it is a significant extension from that to the conclusion that Mustread had an aggravated role relative to other participants. Therefore, we conclude that the grounds given by the trial judge do not adequately support his decision to give Mustread a sentence adjustment.

We can, of course, uphold Mustread's sentence adjustment on any grounds found in the record, regardless of the rationale used by the sentencing judge. *United States v. Carson*, 9 F.3d 576, 585 (7th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 135, 130 L.Ed.2d 77 (1994). But we think that the record demonstrates inadequate support for any § 3B1.1 adjustment. Ultimately, as we will discuss, Mustread simply lacked the aggravated role relative to the other participants necessary to support such an increase.

■ Reviewing a § 3B1.1 sentence adjustment is often a murky inquiry. The Guidelines list seven relevant factors—a nonexclusive list that helps clarify what role a defendant played in a criminal activity. U.S.S.G. § 3B1.1, commentary n. 4. We use that framework to distinguish between a defendant who was an organizer or leader and a defendant who held the lesser role of manager or supervisor. *Skinner*, 986 F.2d at 1096. We also use the seven factors to review whether a defendant could have played any aggravated role at all. *Id.* at 1097. The seven factors are: 1) the exercise of decision making authority; 2) the nature of participation in the commission of the offense; 3) the recruitment of accomplices; 4) the claimed right to a larger share of the fruits of the crime; 5) the degree of participation in planning or organizing the offense; 6) the nature and scope of the illegal activity; and 7) the degree of control and authority exercised over others. U.S.S.G., § 3B1.1, commentary n. 4; *Skinner*, 986 F.2d at 1096.

When reviewing a sentence adjustment, we have not, however, necessarily given each of the seven factors equal weight.[3] Thus, we have recognized that a key inquiry, though not the only inquiry, is whether the defendant exercised some control over at least one other participant. *Brown*, 944 F.2d at 1381. That does not mean that others must have played marionette to the defendant's puppeteer. For these purposes, to control another the defendant may simply have organized or in some way directed him. *Carson*, 9 F.3d at 585.

But however control is defined, Mustread lacked adequate control over any other participant. The record shows that Mustread did not control Merrick, Moak's mule. It is true that in December, 1989 Mustread agreed with Merrick that Merrick would transport some marijuana for him. We do not think that this isolated incident can be properly characterized as control. *See*

---

**3.** The test itself contributes to the murk surrounding review of § 3B1.1 adjustments. For example, "the nature of participation in the commission of the offense," is distractingly vague, at best. In essence, it begs the question, because the ultimate inquiry is "the nature of participation." Taken together, however, the seven factors can provide valuable guidance. But we note that slavish adherence to them is unnecessary: the ultimate question is what relative role the defendant played. *See Skinner*, 986 F.2d at 1097.

*Brown,* 944 F.2d at 1380–81 (noting trial court's conclusion that an isolated incident of tenuous supervision was not enough to support a § 3B1.1(b) adjustment). Merrick worked exclusively under Moak's guiding control, never under Mustread's. Mustread always transported his own marijuana. When Mustread and Merrick agreed that Merrick would help Mustread once, Merrick insisted on getting permission from Moak first. Additionally, the transportation never took place.

Furthermore, the record shows that Mustread did not control any other participant. Mustread did get Figueroa to buy him a pager, which enabled Figueroa to contact Mustread when he had marijuana to sell. But Figueroa was one of Mustread's independent suppliers and co-conspirators; he was never at Mustread's beck and call. Figueroa's buying Mustread a pager was merely a favor enabling both to profit more efficiently from their crime. Nor did Mustread control Moak—they were essentially equal partners in crime, each with his own separate area of distribution. Likewise, Tavizon, Rojas, and others involved in the conspiracy to distribute marijuana were not Mustread's servants, but rather his co-equal criminal associates.

Mustread's actions do not fit the rest of the seven-part framework, either. First, Mustread exercised no decision making authority over other participants. He made decisions for himself, but the record does not show that he decided anybody else's course of action. Second, Mustread recruited no accomplices: the conspiracy had existed for years before he arrived on the scene, and the record does not show that he recruited anybody. Third, Mustread claimed no larger share of profits from the criminal activity. He did claim all the profits he made in his largely autonomous wing of the conspiracy. But the conspirators did not pool their profits and divide them proportionate to the role of each, which might show a greater relative role for some. Fourth, Mustread did not

plan or organize the offense to a greater degree: he doubtless planned his own actions, but that does not show more planning than others.

In short, we do not think Mustread's role was the sort of aggravated role that § 3B1.1 contemplates. Section 3B1.1 contemplates that the recipient have exercised direct influence over another participant, influence rising to the level of an "organizer, leader, manager, or supervisor." After carefully considering the whole record, we conclude that Mustread simply lacked the aggravated role necessary for a sentence adjustment under § 3B1.1(a), or under § 3B1.1(b), for that matter.[4] *Skinner,* 986 F.2d at 1099. Thus, we must find the trial judge's increase of Mustread's offense level clearly erroneous. We vacate his sentence, and remand for resentencing without an adjustment for an aggravated role in the criminal activity.

*3. Section 3C1.1 Sentence Adjustment for Obstruction of Justice*

 The trial judge found that Mustread perjured himself at trial. On that basis the judge gave Mustread a two-level increase for obstruction of justice. Mustread argues that the trial judge's findings were inadequate to support that adjustment.

 If the defendant objects to a sentence adjustment for obstruction of justice based on perjury, the trial judge must make an independent finding establishing that perjury. *United States v. Dunnigan,* —— U.S. ——, ——, 113 S.Ct. 1111, 1117, 122 L.Ed.2d 445 (1993). A person commits perjury when he "gives false testimony concerning a material matter with the willful intent to provide false testimony." *Dunnigan,* —— U.S. ——, 113 S.Ct. at 1116. The Supreme Court has noted that, in this context, "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding." *Id.; United States v. Dominguez,* 992 F.2d 678, 685 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 250, 126

---

4. We also note that concluding that Mustread played an aggravated role would necessarily mean that Moak, Figueroa, Tavizon, and Rojas would all have been eligible for a § 3B1.1 adjustment. Like the Tenth Circuit, "[w]e do not believe that the guidelines intend to define organizer or leader so broadly that nearly every member of a conspiracy qualifies." *United States v. Litchfield,* 959 F.2d 1514, 1523 (10th Cir.1992). *Relative* role is the touchstone of § 3B1.1.

L.Ed.2d 203 (1994). However, such separate findings on each element are not strictly necessary, for it is sufficient if "the court makes a finding of an obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury." *Dunnigan,* —— U.S. ——, 113 S.Ct. at 1117; *United States v. Emenogha,* 1 F.3d 473, 482 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 901, 127 L.Ed.2d 92 (1994).

The trial judge made independent findings of Mustread's perjury. He found that Mustread lied when he flatly denied any connection with marijuana dealing. He further found that Mustread lied when he presented phony timber records, tailored to the numbers contained in drug sale records seized from him, in an attempt to argue that he sold timber, not drugs. Those factual findings are sufficient to satisfy *Dunnigan.* From these findings it is clear that the judge found that Mustread willfully lied to judge and jury about many matters, all crucial to the question of his guilt, and thus all material. Therefore, the trial judge's findings satisfy *Dunnigan.* We have upheld numerous similar findings as consistent with *Dunnigan.* See, *e.g., United States v. Abdelkoui,* 19 F.3d 1178, 1183 (7th Cir.1994); *United States v. Pedigo,* 12 F.3d 618, 628–29 (7th Cir.1993); *Carson,* 9 F.3d at 584. Furthermore, the trial judge's findings here are, to put it mildly, extremely well supported by the record. We see no error in the trial judge's determination that Mustread obstructed justice.

### 4. Other Issues

Mustread appeals on several other grounds. All lack substance, so we dispose of them with the following brief discussion.

■ Mustread claims that his trial process violated the Speedy Trial Act, 18 U.S.C. § 3161, in that more than 70 days that were not excludable from calculation under the Act elapsed between his initial appearance in court and the beginning of his trial. Mustread admits that we have held that, absent a severance, any time excludable to one defendant is excludable to his co-defendants. *United States v. Tanner,* 941 F.2d 574, 580 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 432 (1992). Be-

fore he was found incompetent to stand trial, Charles Mustread filed four motions to continue, each of which the trial judge granted. Time elapsed during the continuances granted to Charles Mustread is excludable to him under the Speedy Trial Act, and thus also excludable to Michael Mustread. *Tanner,* 941 F.2d at 580. Mustread frivolously responds that "special circumstances" exist mandating a different result, without specifying what those circumstances are. We see none. The trial judge also granted various other continuances, both to the government and to Michael Mustread himself. The time elapsed during those continuances was likewise excludable under various sections of the Speedy Trial Act; thus, we conclude that there was no violation of the Act.

■ Mustread claims that there was insufficient evidence to support his conviction. Numerous witnesses testified to Mustread's marijuana trafficking. Various forms of physical evidence and taped telephone conversations buttressed the witnesses' testimony. In the face of this overwhelming evidence, Mustread fails to meet the very heavy burden he faces to prove insufficiency of the evidence. *United States v. Burrell,* 963 F.2d 976, 987 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 357, 121 L.Ed.2d 270 (1993).

■ The district court imposed a $500,000 fine. Mustread vaguely claims that the judge erred by imposing the fine, apparently because Mustread supposedly cannot pay. The trial judge specifically found that Mustread made very large profits on his marijuana trafficking, very little of which the government recovered. The judge decided that Mustread had probably squirrelled away much of his profit, and that he should be deprived of his ill-gotten gains. Mustread responds that there is "absolutely no evidence" that he has the ability to pay the fine. But the question is rather whether Mustread has met his burden of showing that he lacks the ability to pay. *United States v. Jones,* 983 F.2d 1425, 1434 (7th Cir.1993). He has not met that burden, and, furthermore, we note that deprivation of such ill-gotten gains is an appropriate basis for imposing a fine.

18 U.S.C. § 3572(a)(5). We see no error in the fine.

 Prior to trial Mustread filed a motion to suppress the evidence the police found during the search of Charles Mustread's house. Michael Mustread presented no evidence to support his motion, insisting that his only evidence would be his father's testimony. Because his father was incapacitated and thus unavailable, Mustread moved to continue the hearing on the suppression motion. After inquiring about Charles Mustread's health, the judge denied Michael Mustread's motion to continue, reasoning that Charles Mustread was unlikely to become available later, and that to grant the continuance meant indefinitely or permanently postponing the trial. The trial judge did not abuse his discretion, nor has Mustread shown, or even tried to show, that the required actual prejudice to him resulted. *United States v. Koen,* 982 F.2d 1101, 1114 (7th Cir.1992).

 At one point the trial judge asked Mustread a few questions to clarify Mustread's complex testimony about methods of calculating the square footage of lumber harvested from a stand of timber. Mustread now claims that those questions showed the judge's bias against him and prejudiced the jury. It is clear from the record that the judge was merely trying to help the jury and himself fully understand Mustread's confusing testimony. Such questioning is entirely appropriate. *See* FED.R.EVID. 614(b). Regardless, absent plain error, Mustread has forfeited this argument, because he made no objection at trial to the judge's questions. *United States v. Evans,* 994 F.2d 317, 322–23 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 335, 126 L.Ed.2d 280 (1993). Similarly, Mustread did not object at trial to the judge's failure to read a cautionary instruction prior to Merrick's testimony, to the effect that Merrick had pled guilty to the same crime with which Mustread was charged. Mustread has also forfeited that argument. We see no error in the trial judge's actions.

 Mustread cursorily and frivolously claims, without real argument or citation to relevant authority, that his long sentence somehow violates due process. Mustread has not shown us how it violates due process, and we do not see how it could have. That the Guidelines limit judicial discretion does not violate due process. *United States v. Ross,* 905 F.2d 1050, 1054 (7th Cir.), *cert. denied,* 498 U.S. 863, 111 S.Ct. 172, 112 L.Ed.2d 136 (1990). Mustread's sentence fell within the applicable sentencing range. Disappointment with one's unpleasant punishment does not demonstrate lack of due process. We see no error.

For the foregoing reasons, we AFFIRM Mustread's convictions, but we VACATE his sentence and remand for resentencing consistent with this opinion.