In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2078

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

EDWARD W. LEMMONS,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. 98-6-CR-01-Y/H--Richard L. Young, Judge.

Argued August 8, 2000--Decided October 5, 2000

Before BAUER and COFFEY and MANION, Circuit Judges.

COFFEY, Circuit Judge.  Edward Lemmons, his son, and two co-defendants were indicted for, and entered a plea of guilty to, the crime of conspiracy to manufacture and distribute methcathinone, in violation of 21 U.S.C. sec.sec. 846 and 841(a)(1). Lemmons was sentenced to 70 months' imprisonment, the lowest possible sentence within the applicable guideline range. He challenges only the sentencing court's determination that he was "an organizer, leader, manager, or supervisor" in the criminal activity and the consequent imposition of a two-level upward adjustment under U.S.S.G. sec. 3B1.1(c).

Following their indictment on the conspiracy and distribution charges, all three of the other members of this conspiracy pled guilty. The defendant in this case, Edward Lemmons, was the last to do so. According to his PSR, between May 1996 and May 1997, Edward Lemmons, Jerry Lemmons (Edward's son), Jerry Catlett and Jim Smith engaged in a conspiracy to manufacture, possess, and distribute methcathinone in southern Indiana. Edward told the police of numerous people who bought and sold methcathinone for him and reported that he was responsible for financing the methcathinone ring. All of the ingredients for manufacturing methcathinone were found in a Wells Fargo trailer owned by Edward and parked on his property. The defendant had purchased the

trailer in Florida toward the end of the one-year conspiracy, along with four 55-gallon drums of a precursor chemical, that were stored in his home in Trinity Springs, Indiana. At the time of their arrest, however, his son Jerry Lemmons had the keys to the trailer.

Edward Lemmons would pay Catlett cash for acquiring the precursor chemicals, and would give Smith money or methcathinone for trips to Bloomington, Indiana and Louisville, Kentucky. Pursuant to the instructions of Edward Lemmons, each of the named defendants traveled to Louisville and Bloomington to purchase the chemical ingredients for the manufacture of methcathinone and to deliver methcathinone to Edward Lemmons' other customers. Several other people not named in the indictment also traveled to Kentucky to purchase precursor chemicals at Edward Lemmons' behest.

Jerry Catlett had no contact with and did not know Edward Lemmons prior to the time that Edward posted the bond for his release. After his release, Jerry Catlett distributed methcathinone for Edward. At the time of their arrest, Catlett and Edward had stored the material necessary for the manufacturing of methcathinone in the trunk of a car on Edward's property. Catlett eventually purchased a 9mm handgun from Edward and made three additional trips on Edward's behalf to purchase more guns for him. Toward the end of the conspiracy, in the spring of 1997, Catlett moved in with Edward at his Trinity Springs, Indiana, residence where the methcathinone was manufactured. Smith also resided with Edward off and on throughout the course of the conspiracy.

As previously stated, the defendant entered a plea of guilty/1 and, based on the record, the trial court calculated his base offense level at 26 for the 631 grams of methcathinone capable of being produced by the chemicals in the trailer. The court then decreased the offense level by 3 levels finding that Edward Lemmons had accepted responsibility for his crimes, imposed a two-level upward adjustment for possession of firearms, and, over the defendant's objection, also imposed a two-level adjustment for his role in the offense as a manager or supervisor. Lemmons' adjusted offense level was 27, which, with a criminal history category of I, set the guideline range at 70 to 87 months, and the court sentenced him to 70 months' imprisonment and three years' supervised release. He appeals only the court's imposition of the two-level adjustment for being a manager or supervisor under U.S.S.G. sec. 3B1.1.

The district court's factual determination that

Lemmons qualified for an aggravating role adjustment under U.S.S.G. sec. 3B1.1 is reviewed under the clear error standard. See United States v. Roth, 201 F.3d 888, 891 (7th Cir. 2000). The defendant's sole argument on appeal is that the district court erred in determining that he warranted an aggravating role adjustment under sec. 3B1.1. He divides this argument into three subparts. First, he asserts that the information in his PSR was insufficient to form the factual basis for the court's finding that he was a supervisor within the conspiracy. Second, he argues that there is no factual support for determining that his co-defendants' roles were less supervisory. And finally, he argues that the court improperly relied on facts gleaned from Jerry Lemmons' PSR because he was not given an opportunity to challenge them.

On appeal, Lemmons initially argues that the information in the PSR was insufficient to sustain the court's finding that he was a "supervisor." We disagree because the PSR lists a number of factors reflecting his supervisory position, including: (1) Edward Lemmons alone financed the operation; (2) all of the precursor chemicals and equipment for manufacturing the methcathinone were stored on Edward Lemmons' property; (3) each of the other three defendants at some point lived with Edward Lemmons on his property; (4) each of the other three defendants performed services under Edward Lemmons' direction in furtherance of the conspiracy, including acquiring the precursor chemicals as well as the stolen guns; (5) each of the other three defendants sold or distributed the methcathinone that Edward Lemmons manufactured; and (6) above all, he directed and supervised the actions as listed herein. The defendant's response is that the other defendants purchased the precursor chemicals "for" him only in the sense that the co-defendants were going to be in Kentucky anyway, and that they simply made the purchases as a favor. The district court's factual finding that he did in fact direct the purchases of precursor chemicals was based largely on the court's credibility determinations, namely that Lemmons' explanation of the events was less believable than that of the other defendants, and this court refuses to disturb such credibility determinations except in very unusual circumstances. See United States v. Kamoga, 177 F.3d 617, 622 (7th Cir. 1999). Nothing in this record leads us to conclude that the district court's decision to credit the other defendants' testimony over that of Edward Lemmons was clearly erroneous. See United States v. Matthews, No. 99-4158, 2000 WL 994188 at *2 (7th Cir. July 19, 2000) ("If the fact finder chooses between two permissible views of the evidence,

the choice is not clearly erroneous.").

Even assuming that the information in Edward Lemmons' PSR alone was insufficient to establish that the co-defendants were acting under the defendant's direction, the district court was obviously entitled, and required, to review the entire record before it. As we have stated before:

[t]he law is very clear that a sentencing judge "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." * * * * A corollary to this general principle is the rule that a sentencing judge "may consider relevant information without regard to the rules of evidence . . . provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. sec. 6A1.3 (emphasis added). As this court has explained:

The sentencing stage of a trial is one of the most important parts of the criminal process. In order for a judge to be well advised of the facts surrounding the defendant's background, and particularly in view of the judge's obligation to the general public, as well as to the defendant, to be fair, reasonable, and just, it is imperative, that he be allowed to draw upon a wealth of information concerning the defendant's background, from his date of birth up to and including the moment of sentencing . . . . In order to render justice to all, the judge must be able to impress upon a defendant through the expansive contents of an all encompassing sentencing report that we are a country of laws and not of men.

United States v. Hardamon, 188 F.3d 843, 849 (7th Cir. 1999) (internal citations omitted).

The court specifically stated that "the case file and the agent and also Mr. Lemmons' son Jerry indicate that several of these activities were done and completed under Edward Lemmons' instruction." Other information presented to the court, such as the defendant paying Catlett's bail without ever having met him before, and the testimony of the witnesses at the grand jury that the defendant instructed them to purchase precursor chemicals, support the court's conclusion that the other participants in the methcathinone ring acted at his direction. This court has held that the section 3B1.1 adjustment "may apply so long as the criminal activity involves more than one participant and the defendant played a coordinating or organizing role." United States v. Bush, 79 F.3d 64, 67 (7th

Cir. 1996) (citation omitted). The government need only establish that Edward Lemmons had "some real and direct influence, aimed at furthering the criminal activity" on the other participants in the criminal activity. See United States v. Mustread, 42 F.3d 1097, 1103 (7th Cir. 1994). As this court noted in Mustread, those over whom the "leader or organizer" exercises control need not "have played marionette to the defendant's puppeteer." Id. at 1104. Rather, a defendant, in order to be a leader or organizer, "may simply have organized or in some way directed" another member of the conspiracy. Id. at 1104. And, although the defendant makes much of the seven factors in U.S.S.G. sec. 3B1.1(c), comment. (n.4), we have never held that all of the factors are required to establish that a defendant is qualified for a section 3B1.1 increase. See United States v. Fones, 51 F.3d 663, 665 (7th Cir. 1995). Given the district court's finding that the other defendants purchased the guns as well as the precursor drugs and distributed the methcathinone to other sellers pursuant to Edward Lemmons's direction, it is most clear that the defendant exercised more than sufficient control, direction, and supervision over the activities of other participants to qualify for the enhancement as a manager or organizer under section 3B1.1(c).

Finally, Edward argues that the district court improperly looked to his son's PSR as a factual basis for determining Edward's role in the conspiracy. As this court has held, if a judge intends to base a sentencing adjustment on evidence presented during a proceeding to which the defendant was not a party, the judge should give notice to the defendant in advance and provide him with an opportunity to read the transcript of the proceeding. See United States v. Morales, 994 F.2d 386, 389 (7th Cir. 1993). However, Lemmons' counsel neither objected to nor requested a continuance when it became apparent that the sentencing court was making reference to his son's PSR, and we therefore review his claim for plain error. Id. at 389-90. More importantly, Edward cannot prevail on his due process claim because he failed to demonstrate that the information in Jerry's PSR was unreliable. We need not decide to what extent the district court relied on Smith's statements, because Edward has not shown that such information, however it was used, was inaccurate. See United States v. Anaya, 32 F.3d 308, 314 (7th Cir. 1994) ("To successfully challenge her sentence the defendant must show that the information before the court was inaccurate, and that the court relied on it.") (internal quotations and citations omitted). Accordingly, this argument fails as well.

We are convinced that the information provided in Edward Lemmons' PSR, which included the testimony at his change-of-plea hearing, as well as the information in the PSR's of his co-defendants, in the grand jury testimony, and in the testimony at the conspirators' change-of-plea hearings, amply support the district court's finding that he was a manager or organizer of the conspiracy. The PSR's make it apparent that Edwards manufactured the methcathinone, stored it, financially backed the conspiracy, recruited at least one conspirator, directed the three accomplices, obtained the precursor chemicals, and stored the trailer containing bulk quantities of methcathinone ingredients parked on his property. In our opinion, the other three defendants were not equal partners with Edward in the drug operation, as he alleges, by any stretch considering all the facts set forth in the record. The judgment of the district court is

AFFIRMED.


/1 Edward did not waive his right to appeal in his guilty plea.