**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Abiodun OLORUNFEMI, Defendant–Appellant.**

**No. 02–4153.**

United States Court of Appeals, Seventh Circuit.

Argued July 9, 2003.

Decided Dec. 8, 2003.

T. Markus Funk, Office of the United States Attorney, Chicago, IL, for Plaintiff–Appellee.

Andrea E. Gambino, Gambino & Associates, Chicago, IL, for Defendant-Appellant.

Before BAUER, COFFEY, and MANION, Circuit Judges.

## ORDER

After Abiodun Olorunfemi pleaded guilty to conspiring to commit credit card fraud, 18 U.S.C. § 1029(b)(2), the district court sentenced him to 37 months' imprisonment followed by three years' supervised release, and ordered that he pay approximately $216,000 in restitution. Olorunfemi appeals his sentence, arguing that the district court erred when it (1) found him accountable for a $39,000 bank fraud perpetrated by his coconspirators in computing the guideline loss and restitution; and (2) applied a four-level upward adjustment under U.S.S.G. § 3B1.1 after finding him to be a "leader" or "organizer" of the conspiracy. We affirm.

## Background

Olurunfemi came to the United States from Lagos, Nigeria, in October 1998 on a work visa, and settled in Chicago, Illinois. Shortly thereafter, he and two other Nigerian men, Mumuni Apooyin (who also resided in Chicago) and Michael Beaudin (who lived in Los Angeles), embarked on a scheme to steal and share identity information, open fraudulent credit card accounts, generate counterfeit credit card numbers and cards, and defraud banks. Using fraudulently obtained card numbers, the men purchased, or had others purchase for them, at least $177,000 in goods and services nationwide. This amount referred to the verified losses, but the government speculated that the actual losses just from the credit card fraud may have totaled more than $1 million worldwide. Nevertheless, in calculating the total loss for sentencing purposes the government attributed Olorunfemi with only those losses resulting from the documented purchases.

As pointed out above, Olorunfemi, Apooyin, and Beaudin went in to enlist several others to join them and assist them in the nefarious and fraudulent scheme: a Nigerian man named Adekunle Balogun; Beaudin's girlfriend, Valerie West; Cassie Johnson, a young Chicago woman; and Johnson's female friend, Roshunda Odum. Olorunfemi recruited Johnson in May 2000 and provided her with bogus identification and counterfeit credit cards. At Olorunfemi and Apooyin's direction, Johnson became their most aggressive assistant, activating numerous fraudulent credit card accounts and purchasing thousands of dollars of merchandise for them, including–by Johnson's account–at least twenty laptop computers and six stereo systems. Olorunfemi and Apooyin later obtained fake driver's licenses and credit cards for Odum, who also

made fraudulent purchases for Olorunfemi and Apooyin.

Olorunfemi, Apooyin, and Beaudin also employed Johnson to help them defraud banks. In October 2000, she traveled to Phoenix, Arizona, with Apooyin and Beaudin. There, Apooyin and Beaudin took her to get an Arizona driver's license using one of the stolen identities previously given to her by Olorunfemi. At their insistence, Johnson then used that identification to open checking and savings accounts at a Phoenix, Arizona, branch of Bank One. Apooyin accompanied Johnson to the bank and opened two fraudulent accounts. Meanwhile, back in Chicago, Olorunfemi opened an account at another Bank One branch using one of his own aliases. Several months later, in February 2001, Johnson also opened fraudulent accounts at a Bank One branch in Chicago as instructed by Olorunfemi and Apooyin. Apooyin again accompanied Johnson and opened his own fraudulent accounts. Approximately $39,000 derived from a bogus check subsequently was deposited into the Phoenix accounts, though it is not clear from this record how much of that amount was withdrawn or by whom. Before any loss resulted from the opening of the Chicago accounts, however, authorities derailed Olorunfemi, Apooyin, and Beaudin's scheme.

The scheme unraveled the following month when Johnson and Odum were observed fleeing a department store in Chicago after an unsuccessful credit card purchase came to the attention of the store's fraud investigators. Authorities at the store contacted the FBI, and a few days later Odum was apprehended while attempting to rent a car with the same counterfeit credit card. Johnson was apprehended shortly thereafter. Both women decided to cooperate with the authorities, and Olorunfemi and Apooyin were arrested on April 24, 2001. A search of Apooyin's residence after his arrest turned up reams of personal identity information misappropriated from other persons, bogus driver's licenses, and Apooyin's laptop computer containing a pirated version of "Credit Master" software, which the three men had used to identify a large volume of active credit card numbers.

In July 2001 a grand jury sitting in the Northern District of Illinois, Eastern Division, returned a twelve-count indictment charging Olorunfemi and six other accomplices (Apooyin, Beaudin, Balogun, Johnson, Odum, and West) with various offenses arising from the scheme. Olorurnfemi was charged with seven counts, including one count of conspiring to commit credit card fraud, 18 U.S.C. § 1029(b)(2); one count of using multiple unauthorized access devices to obtain money, goods, and services exceeding $1,000 within one year, *id.* § 1029(a)(2); four counts of using a counterfeit credit card, *id.* § 1029(a)(1); and one count of possessing fifteen or more unauthorized or counterfeit access devices, *id.* § 1029(a)(3). He pleaded guilty to the conspiracy count, and the government, among other concessions, agreed to file a motion to dismiss the other six charges against him.

At sentencing, Olorumfemi conceded the factual accuracy of the presentence report but objected to two of its author's findings and recommendations–namely, that he be held accountable for the $39,000 bank fraud in Phoenix for purposes of U.S.S.G. § 2F1.1, and that his role in the offense merited a four-level increase under U.S.S.G. § 3B1.1(a). Under § 2F1.1(b),[1]

---

1. Section 2F1.1 was repealed and consolidated with U.S.S.G. § 2B1.1 in November 2001,

a year before Olorunfemi's sentencing. But the parties agree that § 2F1.1, which was in

the base offense level for a crime of fraud is subject to graduated increases based on the amount of financial loss attributed to the defendant. Here, the inclusion of the $39,000 and the $177,000 in actual losses from the fraudulent credit card purchases put Olorunfemi over the $200,000 threshold, which resulted in an eight-level increase rather than a seven-level increase in his offense level. Olorunfemi argued that the $39,000 should be excluded from his offense total because his co-conspirators, Apooyin and Beaudin, planned and operated the Phoenix bank fraud without his knowledge or assent. He further argued that a four-level upward adjustment under § 3B1.1(a) was unwarranted because Apooyin, and not he, was the leader and organizer of the scheme. Olorunfemi presented no witnesses or evidence to support these contentions.

The district court accepted the recommendations set forth in the PSR on the leadership adjustment based on case law and supporting documents establishing that Olorunfemi was a leader and organizer of the fraud scheme and that he was accountable for the $39,000 bank fraud committed by his coconspirators in Phoenix in furtherance of that scheme. The court rejected Olorunfemi's contention that he was not responsible for the Phoenix fraud, reasoning that Olorunfemi engaged in a "nationwide" scheme that not only involved obtaining fraudulent credit cards with the use of false names and documents (fraudulent driver's licenses, credit cards, bank accounts, etc.) but also using these documents and credit cards to defraud banks. As such, the court concluded, "[I]t would be artificial to put geographical limits on the foreseeability of the loss that would result from this conspiracy, and the

specific kind of conduct in which Olorunfemi engaged." The court went on to find that the $39,000 was includable, noting that, given the scope of the undertaking, "[I]t's fortunate for everybody concerned, including Mr. Olorunfemi, that the loss here was as small as it was." The court likewise rejected Olorunfemi's objection that he was not a leader or organizer of the scheme because, as the court explained, Olorunfemi had personally recruited Johnson, provided her with the means to commit fraud on behalf of him, Apooyin, and Beaudin, and directed her actions. Further, the court reasoned that, although Olorunfemi might not have been "quite as active" in the scheme as Apooyin, he was a "very important leader along with Apooyin of this group of conspirators."

Accordingly, the court applied the eight-level increase under § 2F1.1 and the four-level increase under § 3B1.1. After making those adjustments, as well as others not at issue here, the district court determined that Olorunfemi's total offense level was 19, which combined with his criminal history category of I yielded an imprisonment range of 30 to 37 months. The district court imposed a 37–month term to be followed by three years of supervised release, and ordered that Olorunfemi pay approximately $216,000 in restitution.

### Analysis

We review the district court's legal interpretations of the sentencing guidelines *de novo*, but its factual determinations only for clear error. *United States v. Smith*, 218 F.3d 777, 782 (7th Cir.2000). An appellate court may reverse a factual finding under the clear error standard only when it is left with a "definite and firm conviction that a mistake has been committed."

effect at the time of his offense, should be applied because it is more advantageous to Olorunfemi than the new guideline, § 2B1.1.

*See United States v. Hernandez*, 325 F.3d 811, 816 n. 7 (7th Cir.2003).

*Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). It is not our role to reweigh the evidence or find facts anew; "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574.

■ Olorunfemi first argues that the district court clearly erred in finding him accountable under § 2F1.1(b) for the $39,000 loss stemming from the fraudulent bank accounts opened by Johnson and Apooyin in Phoenix. Where, as here, the defendant engaged in a scheme with others, the sentencing court should calculate the loss for purposes of § 2F1.1(b) "based not only on the defendant's own actions but 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken activity.'" *United States v. Adeniji,* 221 F.3d 1020, 1027 (7th Cir.2000) (quoting U.S.S.G. § 1B1.3 (a)(1)(B)).

Olorunfemi contends that the Phoenix bank fraud was beyond the scope of the criminal activity to which he agreed to participate in, and thus the resulting loss was not reasonably foreseeable to him. He argues that in finding otherwise the district court ignored evidence demonstrating that he was not present in Arizona, that the Arizona trip was initiated by Apooyin and Beaudin without his knowledge, and that he, in fact, was not even on speaking terms with Apooyin at the time. None of this evidence, however, leads to the conclusion that the district court erred. We have repeatedly held that a defendant need not have concrete knowledge of an accomplice's actions to be held accountable under § 2F1.1(b). *United States v. Hernandez,* 325 F.3d 811, 817 (7th Cir.2003); *United States v. Akindele,* 84 F.3d 948, 959 (7th Cir.1996).

There is ample support in the record and case law for the district court's conclusion that Olorunfemi conspired to commit bank fraud as part of the broader credit card and identity theft scheme, and that Johnson and Apooyin opened the bank accounts in Phoenix in furtherance of that fraudulent scheme. Indeed, according to Johnson's grand jury statement which was attached to the PSR, Olorunfemi specifically told her that he and Apooyin intended to open bank accounts, have their friends wire ill-gotten funds to the accounts, and then withdraw those funds before the rejection of the wire transfers when the banks became aware of the fraud. Johnson's part in the plan would be to open the individual account with the false identities Olorunfemi had provided, withdraw the funds shortly thereafter, and then hand those funds over to either Olorunfemi or Apooyin.

Olorunfemi does not dispute that he recruited Johnson and provided her with bogus identities, one of which she used to open the bank accounts in Phoenix, Arizona. However, he argues that he personally did not direct her to open the Phoenix accounts; Apooyin and Beaudin did that without his knowledge. His suggestion that Apooyin and Beaudin were engaged in a separate "West Coast" conspiracy just because Johnson opened the accounts in Phoenix at their specific direction is contradicted by the record and Olorunfemi's own representations in his plea agreement. As the government points out, Olorunfemi admitted in the plea agreement that he, Apooyin, and Beaudin opened illegal bank accounts *as part of their conspiracy:*

> Defendant, Apooyin, and Beaudin as part of their conspiracy traveled together, shared information concerning the conspiracy, recruited individuals to assist them in fraudulently acquiring credit cards and goods with stolen identity information, *illegally obtained bank ac-*

*counts together using false identities....*

Olorunfemi further acknowledged that the Phoenix accounts were opened *in furtherance of that scheme:*

> Defendant, Apooyin, and Beaudin *in furtherance of their scheme* obtained and used fictitious names and the identification of other individuals to create, and to apply for, identification cards such as state-issued driver's licenses, *which identification defendant, Apooyin, Beaudin, and co-defendants Valerie West and Cassie Johnson acting at their request, used to open bank accounts at various financial institutions across the United States, including at Phoenix and Chicago branches of Bank One.*

These binding admissions may end our discussion. *See United States v. Warneke,* 310 F.3d 542, 550 (7th Cir.2002). Olorunfemi's separate conspiracy argument is further belied by the fact that he opened fraudulent accounts at a Bank One branch in Chicago at the same time Johnson and Apooyin opened the accounts in Phoenix. In light of the evidence in the record, and Olorunfemi's own admissions, the district court did not clearly err in finding that the $39,000 bank fraud was attributable to Olorunfemi under § 2F1.1, despite his professed lack of direct knowledge or involvement. Likewise, we reject Olorunfemi's parallel argument that the $39,000 be deducted from the restitution order.[2]

■ Olorunfemi next contests the district court's finding that he was an organizer or leader of the conspiracy for purposes of U.S.S.G. § 3B1.1(a). Section 3B1.1(a) calls for a four-level upward adjustment if the defendant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Application Note 4 to the guideline lists seven factors for the court to consider in determining whether the defendant filled that role: (1) his exercise of decision-making authority; (2) the nature of his participation in the commission of the offense; (3) his recruitment of accomplices; (4) his claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control and authority exercised over others. U.S.S.G. § 3B1.1, comment. (n.4).

Olorunfemi argues that the district court misapplied the guideline by failing to make explicit findings as to all seven of those factors, instead basing its determination solely on Olorunfemi's recruitment and direction of Johnson. This argument is a nonstarter. We have never held that *all* of

---

2. Olorunfemi simply argues that because the district court erred in including the $39,000 bank fraud in its loss calculation under § 2F1.1, that amount should be deducted from the restitution order. That the $39,000 was properly attributed to Olorunfemi for purposes of § 2F1.1, however, does not necessarily resolve the question of whether the district court's order of restitution was proper in that amount under 18 U.S.C. § 3663A. Actual loss suffered by the victim, not intended loss, is the relevant concern for restitution purposes, *see United States v. Rhodes,* 330 F.3d 949, 953 (7th Cir.2003), and we cannot tell from this record how much of the proceeds from the bogus $39,000 check were withdrawn before Bank One froze the accounts. Oddly, the judgment of conviction does not expressly direct that Olorunfemi pay the $39,000 to anyone. But Olorunfemi makes no argument that the amount of actual loss was calculated incorrectly for purposes of § 3663A; rather, he bases his challenge to the restitution order on the same unavailing supposition that because his coconspirators, and not he, opened the fraudulent accounts in Phoenix, he cannot be held accountable for any loss that resulted. For the reasons discussed, this argument lacks merit, and we thus see no ground to disturb the order of restitution.

the factors listed in Application Note 4 are required to establish that a defendant is a leader or organizer. Nor have we mandated that sentencing courts make explicit findings regarding each factor. To the contrary, this court has stated that "slavish" adherence to the listed factors is not required; "the ultimate question is what relative role the defendant played." *United States v. Mustread*, 42 F.3d 1097, 1104 n. 3 (7th Cir.1994). The answer to that question may hinge largely on whether the defendant "exercised some control over at least one other participant." *Id.* at 1104.

In this regard, the district court specifically found that Olorunfemi personally recruited Johnson, provided her with the means to commit the fraud, and directed her actions. Olorunfemi argues this finding was clearly erroneous because, although he recruited her, she did not "answer" to him and he did not direct all of her activities. In particular, he contends that Johnson engaged in some activities at Apooyin's sole behest, such as the Phoenix bank fraud. But the fact that Olorunfemi did not personally direct each and every minor aspect of Johnson's activities is not dispositive. "Control" for purposes of § 3B1.1(a) does not "mean that others must have played marionette to the defendant's puppeteer.... [T]o control another the defendant may simply have organized or in some way directed [her]." *Id.*; *see also United States v. Mijangos*, 240 F.3d 601, 604 (7th Cir.2001); *United States v. Magana*, 118 F.3d 1173, 1205 (7th Cir. 1997).

Johnson's grand jury statement—the truth and accuracy of which Olorunfemi does not dispute—confirms that Olorunfemi organized and directed much of her activities, both personally and with Apooyin. Olorunfemi took Johnson to a passport photo shop to get her picture taken for use on fake driver's licenses that would match those of counterfeit credit cards. Olorun-femi further provided her with stolen identification information, taught her how to falsify credit card applications, and supplied her with counterfeit credit cards. Olorunfemi, along with Apooyin, then drove her to local retailers to buy laptops and other merchandise, which she turned over to either Olorunfemi or Apooyin. In exchange, they gave her additional counterfeit credit cards for her personal use. And, she told the grand jury that she opened the fraudulent bank accounts in Chicago at both Olorunfemi and Apooyin's direction and was to hand any funds deposited to those accounts over to Olorunfemi or Apooyin.

Olorunfemi also argues that the district court erred in finding him a leader or organizer because the record shows that *the* leader and organizer of the conspiracy was Apooyin. He maintains that because Apooyin conducted some activities apart from him, and goes on to point out that the identity information and "Credit Master" program were found in Apooyin's possession and that Olorunfemi once had referred to Apooyin as his "boss." But titles such as "kingpin" or "boss" are not controlling, *see* U.S.S.G. § 3B1.1(a), comment. (n.4), and, as the district court correctly reasoned, more than one person may qualify as a leader or organizer of the same conspiracy, *see id.; Mijangos*, 240 F.3d at 604. Again, the record supports the district court's finding that *both* he and Apooyin were leaders or organizers of the conspiracy. In addition to Olorunfemi's recruitment and direction of Johnson, the undisputed facts related in the PSR suggest that, like Apooyin, Olorunfemi was actively involved in accessing and stealing people's personal information in order for others to set up the fraudulent credit card and bank accounts, facilitating the transfer of money to the bank accounts, contacting credit card companies to increase credit limits, and providing credit card companies with fictitious changes of address to fur-

ther their scheme. Olorunfemi asserts that Apooyin kept a greater share of the profits from the scheme, but he points to no evidence to support this assertion. The record reflects that Olorunfemi, along with Apooyin, reaped substantial benefits from the scheme. Olorunfemi used the fraudulent credit cards to purchase expensive goods for himself and to travel around the country, often staying in luxurious hotels and charging lavish dinners. And both men owned expensive vehicles (Apooyin a Mercedes SUV, and Olorunfemi a Lincoln Navigator), which obviously were financed, at least in part, with the profits from the scheme. On this record, we have no difficulty concluding that the district court did not commit clear error in finding that Olorunfemi was a leader or organizer of the conspiracy.

The judgment of the district court is AFFIRMED.