NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 7, 2012
Decided August 20, 2012

**Before**

RICHARD A. POSNER, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 12-1691

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Western District of Wisconsin. |
| *v.* | No. 11-CR-50-BBC-01 |
| ANDREW G. MAHAFFY, SR., *Defendant-Appellant.* | Barbara B. Crabb, *Judge.* |

**O R D E R**

Andrew Mahaffy pled guilty to using the Postal Service to defraud his employer and received a sentence of 51 months in prison. He appeals the sentence, arguing that the district court clearly erred by identifying him as an "organizer, leader, manager, or supervisor" of a criminal activity and applying a leadership enhancement when calculating his guidelines range. See U.S.S.G. § 3B1.1(c). Because the district court's conclusion was not clearly erroneous, we affirm.

Mahaffy managed project implementation for TDS Telecommunications Corporation, a cable, phone, and internet provider. One of his responsibilities was to hire and manage the contractors who removed and replaced the numerous telephone poles owned by TDS. In 1998 he contacted a contractor named Timothy Furness and pitched a scheme to defraud TDS: Furness's company, FF Tronix, would get telephone-pole-replacement contracts from TDS and subcontract the work to A & J Salvage, a company owned by Mahaffy. Had TDS known this, it would have regarded the arrangement as self-dealing. But neither A & J Salvage nor FF Tronix actually replaced any telephone poles; the record suggests that Mahaffy used his position at TDS to generate duplicative work orders, first paying FF Tronix to replace poles, then hiring (with TDS funds) a legitimate contractor to do the actual replacement—presumably so TDS would not be tipped off to the fraud by unrepaired telephone poles. Using billing information provided by Mahaffy, Furness would mail invoices for completed work to TDS, where Mahaffy would approve them. TDS would pay Furness, who would transfer a portion of that money to Mahaffy, as directed by Mahaffy. Furness estimates that he kept between 20% to 50% of the payments from TDS, although Mahaffy insists that the split was even. The government has characterized the profits as being "split somewhat equally" over the course of the fraud.

Between 1998 and 2010, when Mahaffy retired, FF Tronix submitted more than 300 fraudulent invoices to TDS and received more than $2.5 million in payments. Mahaffy's replacement at TDS became suspicious of the payments to FF Tronix, and TDS soon conducted an audit and uncovered the duplicative work orders. The company hired investigators who interviewed Mahaffy about the payments to FF Tronix; Mahaffy told them, falsely, that he had no idea that FF Tronix employed a subcontractor. Shortly after the interview, he called Furness and left a series of voicemail messages telling Furness to call him back on a phone that TDS could not trace so that they could get their stories straight. He told Furness to lie to the investigators and even tried to educate him on how to remove a telephone pole. (Furness had no idea; he'd never removed one before.) Furness, however, confessed to the investigators that he had helped conceal Mahaffy's self-dealing and did not believe that Mahaffy ever completed the work described in the invoices.

Soon thereafter, Mahaffy was charged with thirty counts of mail fraud and agreed to plead guilty to one count. A probation officer recommended that he receive a two-point offense-level enhancement under the Sentencing Guidelines for his role as an "organizer, leader, manager, or supervisor" of the fraudulent scheme. See U.S.S.G. § 3B1.1(c). Mahaffy objected to the enhancement, arguing that he and Furness had been equal participants in the fraud and that neither had supervised or controlled the other. But the district judge found that the enhancement should apply, explaining in the hearing:

> I believe that the evidence shows that it was Mr. Mahaffy who devised this scheme and recruited Mr. Furness and that it was Mr. Mahaffy who had to tell Mr. Furness how to fill out invoices and fraudulently bill TDS for services that were never completed. And then when the investigation got under way, Mr. Mahaffy lied to investigators and then told Mr. Furness what he should tell the investigators, as well as what to say about the process of removing the telephone poles. And he did direct Mr. Furness about the distribution of profits. So I'm going to give him the two-level enhancement under 3B1.1(c).

The judge calculated a guideline range of 51 to 63 months in prison based on an offense level of 24 and a criminal-history score of I, and sentenced Mahaffy to the low end of that range.

The sole issue on appeal is whether the judge clearly erred by applying the two-point enhancement under section 3B1.1. Mahaffy insists that he and Furness were simply "equal partners," and he emphasizes their equal distribution of profits as evidence that both bore equal responsibility even though they played different roles.

As with many Sentencing Guideline adjustments to offense levels, both up and down, the leadership enhancement asks the sentencing judge to put a specific number on a sometimes gray and ambiguous, and even uncertain, reality. We therefore review the application of the leadership enhancement only for clear error. *United States v. Robertson*, 662 F.3d 871, 876 (7th Cir. 2011); *United States v. Carrera*, 259 F.3d 818, 826 (7th Cir. 2001). "The central concern of § 3B1.1 is the defendant's relative responsibility for the commission of the offense." *United States v. Mendoza*, 576 F.3d 711, 717 (7th Cir. 2009) (internal quotation omitted); see also *United States v. Vasquez*, 673 F.3d 680, 685 (7th Cir. 2012); *United States v. Cruz*, 120 F.3d 1, 3 (1st Cir. 1997) (en banc). A defendant who had no greater role than any other participant cannot receive a leadership enhancement, but if the defendant played an aggravating role, the enhancement is proper. *United States v. Mustread*, 42 F.3d 1097, 1103 (7th Cir. 1994). Although Mahaffy suggests that we also look to the seven factors listed in Application Note 4 of U.S.S.G. § 3B1.1, we recently held that this list was not meant to be applied to two-point leadership enhancements under § 3B1.1(c) since it is to be used to distinguish between a leadership and organization role (worth up to four levels) from one of "mere management or supervision." *United States v. Figueroa*, 682 F.3d 694, 696 (7th Cir. 2012).

Although the facts of this case do not compel application of the two-point leadership enhancement, it certainly was not clear error for the court to apply the enhancement. The record shows that Mahaffy was the "heart, soul and main artery of the fraud." See *United States v. Peterson-Knox*, 471 F.3d 816, 825 (7th Cir. 2006). He devised the scheme and recruited its only other participant. He controlled the flow of billing information to Furness, so he also controlled when and to what extent the frauds would occur. The record documents several instances of

Mahaffy directing, instructing, or advising Furness, but no instances of Furness doing the same to Mahaffy. The approximately equal distribution of profits is one fact that tends to suggest equal responsibility and might have persuaded the district court not to impose the enhancement. See *Mustread*, 42 F.3d at 1105. That factor, however, does not necessarily preclude application of the leadership enhancement, see *United States v. Parker*, 25 F.3d 442, 446–47 (7th Cir. 1994) (upholding four-point leadership enhancement for defendant who received *smaller* shares than co-defendants), and the district court here acted reasonably in finding that it was outweighed by the other evidence of Mahaffy's greater responsibility.

Accordingly, the district court's sentence of Mahaffy is AFFIRMED.