In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 21-2485

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTWAIN MOORE,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cr-00109-RLY-DML-1 — **Richard L. Young**, *Judge.*

_____

ARGUED JUNE 7, 2022 — DECIDED NOVEMBER 7, 2022

_____

Before HAMILTON, KIRSCH, and JACKSON-AKIWUMI, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Appellant Antwain Moore was sentenced to 120 months in federal prison for multiple drug offenses. One factual foundation for the sentence was the district court's finding that 55.6 grams of methamphetamine found in Moore's home were 100% pure. Moore appeals, arguing that a chemist's affidavit that he submitted was "some evidence" sufficient to call the purity finding into question

and that the government failed to support the finding on purity. See, e.g., *United States v. Mustread*, 42 F.3d 1097, 1101 (7th Cir. 1994) (if defendant produces "some evidence" that calls information in presentence report into question, government bears burden of persuasion on factual issue). Moore contends that the district court erred by placing a burden on him to perform independent testing and by assuming, without supporting evidence, that the Drug Enforcement Administration's methods for testing purity are reliable and were applied correctly in Moore's case.

We agree with Moore and remand for re-sentencing. The "some evidence" standard is not a demanding one. The chemist's affidavit here did not purport to resolve conclusively the accuracy of the DEA test results, but it raised a fair question about them.

I.  *Factual and Procedural Background*

Moore pled guilty to seven counts of violating 21 U.S.C. § 841(a)(1), including one count based on methamphetamine found in Moore's home. A probation officer submitted a presentence investigation report (PSR) recommending a Sentencing Guidelines base offense level of 30. That base offense level depended on the total "converted drug weight" for all counts. About 99% of the converted drug weight total was based on 55.6 grams of methamphetamine found in Moore's house. To calculate the amount of "actual" methamphetamine for purposes of U.S.S.G. § 2D1.1(5) and the drug conversion tables, the probation officer consulted a laboratory report from the DEA. According to that report, the net weight was 55.6 grams (± 0.2 grams), the amount of pure substance was 55.6 grams (± 3.4 grams), and the methamphetamine purity was 100% (± 6%).

Before sentencing, Moore objected to the PSR's recommended offense level, arguing that the government did not have evidence demonstrating that the reported purity level was accurate. He argued that, absent better evidence of how the purity was established, the court should treat the 55.6 grams as a "mixture" containing methamphetamine. That would cut his base offense level from 30 to 24 and his guideline range from 130–162 months in prison to 77–96 months. If Moore had done nothing more by way of objection, he would have offered what we have repeatedly described as only a "bare denial" of the PSR information, which ordinarily is not enough to shift the burden of production or to require a hearing. E.g., *United States v. Willis*, 300 F.3d 803, 807 (7th Cir. 2002); *Mustread*, 42 F.3d at 1102.[1]

In this case, however, Moore offered more than a bare denial. To support his objection, he submitted the affidavit of a chemist, Dr. Derek Beauchamp, who explained that exact purity could not be determined with the DEA's method and that the purity level of Moore's drugs could be substantially lower than the DEA had reported:

> Based on the reports I received, the material was confirmed to be methamphetamine with high purity based on the match to the reference GC

---

[1] We say "ordinarily not enough" because there are cases where the PSR itself may not indicate that information is reliable enough to support a sentencing decision. In such cases, a "bare denial" may be enough to require the government to come forward with reliable evidence. See, e.g., *United States v. Helding*, 948 F.3d 864, 870–71 (7th Cir. 2020) (PSR reported drug quantities based on confidential informants of unknown reliability); *United States v. Isirov*, 986 F.2d 183, 186 & n.1 (7th Cir. 1993), citing *United States v. Coonce*, 961 F.2d 1268, 1280 (7th Cir. 1992).

chromatogram. Based on the match to a refer-
ence library pattern, the exact purity could not
be determined. To determine the purity, one
would collect a sample of a known purity refer-
ence material and use that to quantify the
amount of methamphetamine in the sample in
question. This approach could lead to a poten-
tial lower purity level of the sample, thus poten-
tially lowering the total amount of metham-
phetamine in the total sample. Nor can it be de-
termined if the purity level is consistent
throughout.

In response to this affidavit, the government did not sub-
mit additional evidence. It instead only argued that Dr. Beau-
champ's affidavit was "not conclusive that the government's
procedures were improper or led to a bad result" and that
"the DEA's testing procedures are well accepted in the scien-
tific community." The government added that Moore could
have retested the methamphetamine and did not.

The court agreed with the government's arguments, over-
ruled Moore's objection, and adopted the PSR's determina-
tion that Moore was responsible for 55.6 grams of actual meth-
amphetamine. The court explained:

The DEA has standard protocol that they follow
when conducting tests to determine purity.
There's no indication here or no evidence before
the Court that these protocols are not reliable.
So the Court finds that the government has es-
tablished the purity level by a preponderance of
the evidence here. [Moore] could have had an
independent test, did not, and the DEA

> protocols are well accepted among the scientific community.

Based on the higher purity level for those 55.6 grams, the court calculated a guideline range of 130 to 162 months in prison. The court then sentenced Moore to 120 months. Moore has appealed, challenging only the purity finding.

II. *Analysis*

In applying the Sentencing Guidelines, facts like drug purity that can raise the guideline range must be established by the government by a preponderance of reliable evidence. *United States v. Carnell*, 972 F.3d 932, 938 (7th Cir. 2020); see also *United States v. Watts*, 519 U.S. 148, 156 (1997); U.S.S.G. § 6A1.3, comment ("The Commission believes that use of the preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding the application of the guidelines to the facts of a case.").

Reliability is the touchstone of this case: Moore has a due-process right to be sentenced based on reliable information. E.g., *United States v. Helding*, 948 F.3d 864, 870 (7th Cir. 2020), citing *United States v. Tucker*, 404 U.S. 443, 447 (1972). We review a decision on the reliability of evidence for abuse of discretion and any factual findings for clear error. *Carnell*, 972 F.3d at 943.[2]

---

[2] A word about terminology, because the record here contains numerous references to "ice." Under the Guidelines, the amount of "actual methamphetamine" is the weight of that substance contained in a mixture. U.S.S.G. § 2D1.1(c), note (B) (illustrating with example: "a mixture weighing 10 grams containing PCP at 50% purity contains 5 grams of PCP (actual)"). "Ice" refers to a mixture with "d-methamphetamine

We agree with Moore that the district court erred when it determined that the government had "established the purity level by a preponderance of the evidence," and that "there was no indication here or no evidence before the Court that [the DEA] protocols are not reliable." The government submitted DEA test results that were not supported by any affidavit. When the reliability was questioned in Dr. Beauchamp's affidavit, the government chose to rest on an assumption that the district court adopted: that the DEA has reliable and generally accepted methods of testing drug purity. We assume that's probably true as a general matter, but in a particular case, a defendant whose liberty is at stake is entitled to hold the government to its burden of proof by a preponderance of reliable evidence. An unsupported assumption does not tell us anything about whether test results in a particular case can reasonably be relied upon.

The district court overstated the case in saying there was "no indication here or no evidence before the Court that these protocols are not reliable." The record's only actual evidence about the reliability of the test results is Dr. Beauchamp's affidavit. To call into question the reliability of evidence used in a presentence investigation report, we have long required the defendant to "furnish some evidence." *United States v. Mays*, 593 F.3d 603, 608 (7th Cir. 2010) (assuming objection sufficient to question reliability but finding no error because challenged statements from confidential informants were corroborated in record); accord, *Willis*, 300 F.3d at 807; *United States v. Jones*, 209 F.3d 991, 996 (7th Cir. 2000); *United States v. Taylor*, 72 F.3d 533, 547 (7th Cir. 1995); *Mustread*, 42 F.3d at 1101; *United States*

---

hydrochloride of at least 80% purity." *Id.*, note (C). Thus, a drug quantity found to be "ice" can contain methamphetamine that is 80 to 100% pure.

*v. Isirov*, 986 F.2d 183, 186 & n.1 (7th Cir. 1993); *United States v. Coonce*, 961 F.2d 1268, 1280 (7th Cir. 1992).

Producing "some evidence" is not a demanding standard, however. See *Superintendent v. Hill*, 472 U.S. 445, 455–56 (1985) (due process requires only "some evidence," rather than more stringent evidentiary standard, to support prison discipline that deprives prisoner of liberty; fairness requires "some basis in fact"); *United States v. Mayfield*, 771 F.3d 417, 440 (7th Cir. 2014) (en banc) (defendant who offers "some evidence" of entrapment is entitled to jury instruction on the defense, and "this initial burden of production is not great").

Moore provided more than a bare objection. He offered the opinion of an independent expert about the reliability of the DEA's test results. Dr. Beauchamp explained that the DEA's results were potentially inexact and inconsistent, pointing out in particular that the DEA's report did not enable him to determine whether the purity level of drugs was consistent throughout the 55.6 grams.

We recognize that Dr. Beauchamp did not include the words "not reliable" or "unreliable," but that was the substance of his opinion, and we require no specific words to question the evidence summarized in the PSR. In substance, Dr. Beauchamp identified potential shortcomings. Given the lack of information accompanying the DEA report, those potential problems were sufficient to call into question the reliability of the test results and to call for evidence supporting the PSR's recommendation.

The district court rejected the Beauchamp affidavit without addressing it explicitly. The court instead pointed to Moore's failure to carry out his own purity test and to the

reliability of the DEA protocols. As to the former, recall that Moore's burden was to furnish "some evidence" calling into question the reliability of the information in the PSR. E.g., *Mays*, 593 F.3d at 608. No specific type of evidence is required. Moore certainly could have sought permission to do independent testing, but the burden of persuasion is on the government. Moore was not required to come forward with more specific and persuasive evidence contradicting the purity assertion in the PSR, let alone "conclusive" contrary evidence, as the government suggested. Cf. *Carnell*, 972 F.3d at 944 ("This is not to say that a lab report is always needed to meet the burden required by 2D1.1, note C.").

The district court's assumption about the general reliability of DEA testing protocols is also not supported by any evidence in the record. The laboratory report contains only a brief explanation of the process involved. That explanation is all but opaque to generalist judges without substantial background in organic chemistry. It makes intuitive sense, of course, that the nation's premier drug-interdiction agency would use reliable methods in analyzing drug samples. But as noted, that general assumption says nothing about whether the methods used in a particular case were suitable and reliable. No evidence in this record supports the government's assertion, adopted by the district court, about the reliability and general acceptance of DEA testing methods. See *Helding*, 948 F.3d at 869–70. Without such evidence, Moore is correct that the court in effect took judicial notice of the trustworthiness of DEA protocols, both in general and as applied. Yet those facts are not "generally known," nor can they be "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

The government suggested at oral argument that requiring it to demonstrate the reliability of DEA drug analyses at sentencing would waste resources and allow defendants to clog up the courts with specious objections. We do not agree. When the government relies on hearsay—such as the laboratory results here—and a defendant raises a plausible objection about whether its contents are indeed reliable, the government can reasonably be required to provide more of a foundation. See *Helding*, 948 F.3d at 869–70 (district court abused its discretion when its "reasoning came very close to … saying it credited the [] information because of its inclusion in the PSR"). Here, the government provided no support other than a mistaken suggestion that Moore was required to have performed independent testing and an unsupported assertion that DEA protocols are so reliable that they are not subject to question in an individual case.

We are not persuaded by the government's parade of system-choking horribles. The familiar requirement that the defendant ordinarily offer "some evidence" supporting an objection to factual assertions in a presentence investigation report should weed out most baseless objections. In the mine run of cases, a defendant who has already been convicted of a drug offense will often have reason to know whether contesting purity would be worthwhile. If the DEA protocols are indeed as reliable as the district court thought in this case, a few litigated and unsuccessful challenges are likely to persuade defendants not to keep raising the issue without some case-specific reasons to question reliability. In any event, the potential inefficiencies, which we do not think will be great, do not warrant silencing reasonable questions by a criminal defendant who faces a greater deprivation of liberty based on the accuracy of a laboratory test of a drug sample.

Because Moore provided "some evidence" questioning whether the alleged purity of the methamphetamine sample was reliable, and because the government submitted no evidence in response, the district court erred when it accepted the government's unsupported assertions and effectively shifted the burden of persuasion to Moore. On remand, the district court may not rely on the test results without requiring the government to furnish affirmative support for their reliability and allowing Moore to challenge that evidence. Moore's sentence is VACATED and the case is REMANDED for re-sentencing.

KIRSCH, *Circuit Judge*, dissenting. The district court did not err when it accepted the Presentence Investigation Report's drug quantity finding and credited the Drug Enforcement Agency's lab results regarding the purity of the methamphetamine found in Antwain Moore's home. It was Moore's burden to provide some evidence that "call[ed] into question the reliability or correctness of the facts contained in the PSR." *United States v. Mays*, 593 F.3d 603, 608 (7th Cir. 2010). But Moore offered only the speculative observations of a chemist who provided nothing to cast doubt on the accuracy of the DEA's lab report. Because all of the reliable evidence before the district court supported its drug quantity finding, we should affirm Moore's sentence.

When a district court relies on facts from a presentence report "that is well-supported and facially reliable," a defendant raising a dispute must "show the judge that disputed factual information in the report is inaccurate." *United States v. Marks*, 864 F.3d 575, 580 (7th Cir. 2017). Put another way, it is the defendant's burden to show that a PSR is inaccurate or unreliable with "more than a bare assertion of inaccuracy[.]" *Mays*, 593 F.3d at 608. Instead, the defendant "must furnish some evidence that calls into question the reliability or correctness of the facts contained in the PSR." *Id.* Only when the defendant produces such evidence does the burden shift back "to the government to demonstrate the accuracy of the information." *Id.*

The majority's holding rests on the false premise that Dr. Derek Beauchamp's affidavit called the reliability of the DEA's lab report into question. I fail to see how. Dr. Beauchamp stated that "the exact purity could not be determined" using the DEA's methods. But exact purity is not required, the

DEA's lab results provide a margin of error, and the report expressly disclaims complete accuracy. Could the DEA's method determine purity within the margin of error provided in the report? Dr. Beauchamp doesn't say. Dr. Beauchamp further posited that an alternative approach "could lead to a potential lower purity of the sample, thus potentially lowering the total amount of methamphetamine in the total sample." But how likely and by how much? More precisely, would the alternative method bring the purity level below the threshold necessary to have any effect on Moore's base offense level? We are left to guess. Dr. Beauchamp's heavily qualified statement about an alternative approach offers no basis to question the accuracy of the DEA's report, let alone to conclude, as the majority does, "that the purity level of Moore's drugs could be substantially lower." Finally, Dr. Beauchamp concluded his affidavit by declaring: "Nor can it be determined if the purity level is consistent throughout." It is unclear whether Dr. Beauchamp is referencing the DEA's testing method, his proposed alternative method, or the testing of methamphetamine purity in general. In any event, Dr. Beauchamp's concluding remark about the consistency of the substance does not conflict with anything in the DEA's report. And overall, Dr. Beauchamp's vague and equivocal affidavit identified no potential shortcomings with the DEA report.

None of this means, as the majority suggests, that Moore had no way of challenging the report. To the contrary, if Moore wanted to raise genuine questions regarding the accuracy of the DEA's purity finding, he had several options at his disposal. First, Moore could have submitted an affidavit from an expert that actually undermined the DEA's lab report, or he could have asked Dr. Beauchamp to appear at the sentencing hearing to fill the gaps in his affidavit. Moore decided not

to do so. Second, Moore could have subpoenaed the forensic chemists who analyzed and approved the DEA's report. For whatever reason, despite having access to this information well before sentencing and providing the report to Dr. Beauchamp, Moore chose not to seek the forensic chemists' testimony. Third, Moore could have subpoenaed and cross-examined other DEA chemists or lab technicians about the agency's testing procedures. He didn't do that either. Finally, as the government and the district judge pointed out at sentencing, Moore could have submitted the methamphetamine for independent testing, but he decided against that route too.

The majority says that "[n]o specific type of evidence is required." True enough, and the options above are by no means an exhaustive list of the evidence Moore could have offered at sentencing. But to carry his burden of showing that the DEA's lab results were inaccurate or unreliable, Moore was required to at least "furnish some evidence that call[ed] into question [its] reliability or correctness[.]" *Mays*, 593 F.3d at 608. No one stopped Moore from presenting such evidence or silenced reasonable questions about the accuracy of the DEA's procedures. It was Moore's choice to supply one affidavit that failed to undermine the report, and the district judge was not required to hold a hearing when no legitimate questions had been raised about the report's accuracy.

One other related point. Citing only Federal Rule of Evidence 201, the majority says that the district judge "in effect took judicial notice of the trustworthiness of DEA protocols." Rule 201 permits courts to take judicial notice of facts that are generally known and not subject to reasonable dispute. By invoking judicial notice here, the majority implies that the district judge determined that the reliability of the DEA's

protocols was beyond reasonable dispute. But the judge did no such thing. Far from finding the trustworthiness of the DEA's protocols beyond dispute, the judge merely determined that the chemists' report (on which the PSR relied) contained sufficient indicia of reliability to support its probable accuracy. As with all facts contained in a PSR, that is all the district court needed to find to rely on the report at sentencing. See *United States v. Sunmola*, 887 F.3d 830, 839 (7th Cir. 2018). Because Moore offered nothing to rebut the report's reliability, the district court did not abuse its discretion in determining Moore's drug quantity.

The majority's approach invites baseless challenges to drug quantity determinations. Even when a defendant offers no evidence suggesting that the government's lab testing results are inaccurate, according to the majority, a defendant need only point to an alternative method that "could lead to a potential lower purity of the sample." This result runs contrary to *Mays* and our precedents, which require a defendant to furnish more than mere speculation to undermine facially reliable information in the PSR. See, e.g., *United States v. Betts-Gaston*, 860 F.3d 525, 539 (7th Cir. 2017) ("[W]here there is an apparently reliable basis for information in a presentence report, bare denial is not enough. The defendant must produce some evidence calling the presentence report into question, unless the report contains only a naked or unsupported charge.") (cleaned up).

But defendants who choose this route should proceed cautiously. "In the mine run of cases," the majority assures, "a defendant who has already been convicted of a drug offense will often have reason to know whether contesting purity would be worthwhile." I agree that defendants like Moore are

well-positioned to know whether their objections to the purity of the substances they intended to market will have any merit. A baseless objection to drug quantity will not only leave the defendant's base offense level unchanged, it may well result in a higher total offense level at the end of the day, a risk that Moore now runs in this case. District courts have broad discretion to deny acceptance of responsibility credit to a defendant who frivolously contests drug quantity findings that are "amply supported by the record." *United States v. Acosta*, 534 F.3d 574, 581 (7th Cir. 2008); U.S.S.G. § 3E1.1, Application Note 1(A). Whether Moore's objection falls into that category is for the district judge to decide in the first instance on remand.

I respectfully dissent.