In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-2131

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DEMARRIO BARKER,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:20-cr-316 — **Sarah Evans Barker**, *Judge.*

ARGUED APRIL 11, 2023 — DECIDED SEPTEMBER 11, 2023

Before SCUDDER, ST. EVE, and LEE, *Circuit Judges.*

LEE, *Circuit Judge.* Demarrio Barker pleaded guilty to distributing methamphetamine, 21 U.S.C. § 841(a), and was sentenced to 300 months in prison. Barker challenges his sentence, arguing that the district court credited unreliable hearsay when determining his guidelines range under the United States Sentencing Guidelines. He also argues that the district court erred in applying the obstruction of justice enhancement under Section 3C1.1 of the Guidelines. Because we see

no reversible error in the district court's factual findings or legal conclusions, we affirm.

## I.   BACKGROUND

### A. Investigation

Sometime before the summer of 2020, law enforcement began investigating Barker's drug trafficking activities. As part of this investigation, officers set up several controlled buys. On June 22, 2020, Barker sold 109.8 grams of methamphetamine to a confidential informant. A month later, on July 31, 2020, Barker sold the confidential informant another 106.4 grams of methamphetamine. Both drug deals took place at a secondary residence owned by Barker, which was located on East Broadway Street in Kokomo, Indiana. Barker's primary residence (where he lived with his wife, Chelsea Hulse) was located on West Havens Street in Kokomo.

After these drug transactions, officers obtained search warrants for both the East Broadway and West Havens residences. The officers planned to execute both warrants simultaneously on November 30, 2020. Unbeknownst to officers, however, Barker would not be at either of his residences that day. Although security footage from November 29 showed Barker in and around his East Broadway residence, he flew to California the morning of November 30. The only people staying at the East Broadway residence were a man named Sirtorry Carr (a friend of Barker's) and Carr's children. Barker had given Carr permission to stay there while Carr hid from an open arrest warrant. Meanwhile, Barker's wife was staying at their primary residence on West Havens.

On the day of the search, officers monitored both residences in preparation of executing the warrants. At about 4:03

p.m., the officers at West Havens stopped Barker's SUV from exiting the home, thinking that Barker might be in the car. Instead, only Barker's wife Chelsea and their children were inside. While stopped by the officers, Chelsea called Barker on her cell phone via the Facetime app. This call lasted from about 4:11 to 4:14 p.m., and the officers' body camera footage recorded Barker's voice asking Chelsea whether the police had a search warrant.

After finishing the Facetime call, Barker immediately contacted Carr. According to phone records, Barker called Carr at 4:15 p.m. and engaged in a 51-second phone call. Shortly thereafter, other officers who were observing the East Broadway residence saw Carr exit the home with a trash bag, enter an abandoned house next door, and return without the trash bag in hand. Those officers then executed the search warrant of the East Broadway residence. They also searched the nearby area where Carr had gone and recovered a trash bag containing three firearms and 464 grams of methamphetamine.

During the search of the East Broadway home, officers began questioning Carr. Carr gave the officers several inconsistent stories about his actions leading up to the search. Initially, Carr denied having left the home at all, even though officers had observed him doing so. After officers presented the recovered contraband, Carr claimed that a man named "Ed" had hidden the bag. Although there was an "Ed" who was remodeling Barker's East Broadway home, he was being held at the West Havens residence at the time. Even after officers informed Carr of this fact, he continued to deny any knowledge of the bag.

After the search, Carr was taken into custody and charged with several state law offenses. Two weeks later, he was federally indicted for possession of methamphetamine with intent to distribute and possession of a firearm as a felon. Shortly after the indictment, Special Agent Erik Collins (who was investigating Barker's case and had been involved in the East Broadway search) interviewed Carr.

Carr told SA Collins that the bag filled with firearms and methamphetamine belonged to Barker and that Barker had instructed him to remove the bag from the East Broadway residence. After this interview, Carr pleaded guilty to the firearm count, and the government dismissed the methamphetamine count.

## B. Sentencing

Meanwhile, Barker was indicted for two counts of distributing 50 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a). Barker eventually pleaded guilty to the counts. He also admitted to selling 216.2 grams of methamphetamine during the two controlled-buy drug deals in June and July 2020.

Prior to Barker's sentencing hearing, the probation office issued a presentence investigation report (PSR) that recommended no sentencing enhancements and included the 216.2 grams when determining Barker's offense conduct and drug quantity. Based on this, and after a three-level reduction for acceptance of responsibility, Barker's base offense level was 29. With a criminal history category of VI, Barker's initial guidelines range was between 151 to 188 months of imprisonment.

The government then informed the probation office about Carr's statements to SA Collins, which prompted an amended PSR. Based on Carr's statements, the probation office found that Barker had instructed Carr to remove the trash bag from the East Broadway residence and, thus, Barker was responsible for the three firearms and 464 grams of methamphetamine in the bag. This finding more than tripled Barker's drug quantity and increased his base offense level by two levels.

The probation office also recommended three additional sentencing enhancements that increased Barker's offense level by two levels each: possessing firearms in connection with drug trafficking (based on the three firearms in the trash bag), *see* U.S.S.G. § 2D1.1(b)(1); maintaining a premises for the purpose of distributing a controlled substance (based on the amount of drugs at the East Broadway residence), *see id.* § 2D1.1(b)(12); and obstruction of justice (based on Barker's instruction for Carr to hide the contraband), *see id.* § 3C1.1. Under the amended PSR, Barker's total offense level was 37, and his new guidelines range was 360 months to life imprisonment.

Before sentencing, Barker objected to several portions of the amended PSR, including the revised drug quantity, the finding that he had called Carr with instructions to remove the contraband, and the three new sentencing enhancements. Barker, along with the government, also submitted briefs that described the circumstances surrounding the search of the East Broadway residence and Carr's subsequent statements to SA Collins.

At the sentencing hearing, the district court heard live testimony from SA Collins, who recounted his interview of Carr. When cross-examined by Barker's counsel, SA Collins

acknowledged that Carr had admitted knowing about the firearms in the trash bag, not the methamphetamine. SA Collins also noted that the total methamphetamine in the trash bag was about the size of two softballs and did not feel like firearms. Lastly, SA Collins also testified that Carr was a known drug dealer, who had prior convictions for dealing cocaine and possessing marijuana. But, according to SA Collins, Carr's phone records revealed that he sold only pills and marijuana (not methamphetamine), and the government's investigation of Barker produced nothing to indicate that Carr was one of Barker's drug trafficking partners.

At the end of the hearing, the district court overruled Barker's objections to the amended PSR, found that "the purpose" of Barker's call to Carr "was to get the stash out of the house," and adopted the PSR's findings. As for Carr's statements implicating Barker, the district court acknowledged that Carr was "not necessarily" a person who would be expected "to step up and tell the truth" but observed several corroborating facts that supported Carr's account.

First, the district court repeatedly emphasized the "tight chronology of events" between the time that Barker learned about the search warrant from his wife, his call to Carr, and Carr's prompt removal of the bag from the East Broadway house. The court also noted that Barker had visited the East Broadway home the night before the search and that this was Barker's secondary residence, where he conducted his drug business. The court also found that it was unlikely Carr was dealing drugs out of the East Broadway home given SA Collins's testimony and the presence of Carr's children at the house.

In the end, the district court sentenced Barker to an under-guidelines sentence of 300 months of imprisonment. Barker appeals.

## II.    ANALYSIS

Barker raises two challenges to his sentence. First, Barker argues that the district court leaned on unreliable hearsay to adopt the amended PSR's higher drug quantity and sentencing enhancements. Second, Barker claims that the record does not support the obstruction of justice enhancement.[1] We address each in turn.

### A. Hearsay

Barker contends that the district court should not have relied on Carr's hearsay statements that the methamphetamine and firearms in the trash bag belonged to Barker and that Barker had instructed Carr to remove it from the East Broadway house. According to Barker, the hearsay was unreliable because Carr had provided officers with varying accounts before inculpating Barker and had strong motivation to shift blame for the contraband given Carr's own pending indictment. Additionally, Barker argues, Carr's denial of knowing that the bag contained methamphetamine was implausible.

It is well-established that the normal rules of evidence— including those concerning the admissibility of hearsay—do

---

[1] At oral argument, Barker's counsel conceded that if the district court properly relied on the hearsay statements, the sentencing enhancements were also proper. Nonetheless, because Barker's opening brief separately addressed the obstruction of justice enhancement, we consider that argument as well. Because the opening brief did not otherwise challenge the remaining sentencing enhancements, any such argument is waived. *See, e.g.*, *United States v. Vargas-Garnica*, 332 F.3d 471, 473 n.1 (7th Cir. 2003).

not apply at sentencing. *United States v. Brown*, 973 F.3d 667, 711 (7th Cir. 2020); *United States v. Barnes*, 117 F.3d 328, 336 (7th Cir. 1997). At the same time, criminal defendants have a due process right to be sentenced based on reliable information. *United States v. Moore*, 52 F.4th 697, 700 (7th Cir. 2022). That means a sentencing court may only rely on hearsay that has "sufficient indicia of reliability to support its probable accuracy." *United States v. Hankton*, 432 F.3d 779, 789 (7th Cir. 2005) (quoting *United States v. Lemmons*, 230 F.3d 263, 267 (7th Cir. 2000)); *see also* U.S.S.G. § 6A1.3(a).

As Barker sees it, the district court should have presumed Carr's statements were unreliable. In support, he cites our holding that "a 'very strong presumption of unreliability' attaches to [hearsay] statements that are: (1) given with government involvement; (2) describe past events; and (3) have not been subjected to adversarial testing." *United States v. Jones*, 371 F.3d 363, 369 (7th Cir. 2004) (quoting *United States v. Ochoa*, 229 F.3d 631, 637 (7th Cir. 2000)). But, as we have explained, this presumption applies only at trial, not at sentencing. *United States v. Isom*, 635 F.3d 904, 907 (7th Cir. 2011); *United States v. House*, 551 F.3d 694, 699 n.2 (7th Cir. 2008). That is because the presumption is rooted in the defendant's constitutional right to confront his accuser at trial. By contrast, the Confrontation Clause does not apply at sentencing, and neither does this presumption. *Isom*, 635 F.3d at 907.

Instead, the district court must ask whether Carr's hearsay statements were sufficiently reliable given the totality of the circumstances. "Reliability can be established by internal consistency, corroborating evidence, and providing missing facts and details." *Id.* at 908. The more dubious the hearsay, the more probing the district court's inquiry must be. For

instance, we have said that district courts should "look[] with skepticism on the use of untested self-serving statements by codefendants." *United States v. Busara*, 551 F.3d 669, 672 (7th Cir. 2008). Additionally, where a witness has provided inconsistent testimony, the district court must "provide an explanation for crediting one of the witness's inconsistent statements over the others," *United States v. Zehm*, 217 F.3d 506, 514 (7th Cir. 2000), and undertake "a sufficiently searching inquiry into the contradictory evidence." *United States v. McEntire*, 153 F.3d 424, 436 (7th Cir. 1998). Ultimately, we ask whether the district court "clearly erred in finding that the government proved [the defendant's] conduct by a preponderance of the evidence." *United States v. Rollerson*, 7 F.4th 565, 570 (7th Cir. 2021).

We see no clear error here. The district court pointed to numerous facts strongly corroborating Carr's story. Most significantly, the court emphasized the "tight chronology" of the events surrounding the search of the East Broadway residence: Barker learned about a likely search warrant from his wife (as confirmed by police body camera footage), Barker then immediately called Carr for a 51-second phone call (as confirmed by phone records), and Carr quickly removed the trash bag filled with contraband from the residence (as confirmed by police surveillance).

The district court also considered—and rejected—the possibility that the contraband belonged to Carr, rather than Barker. Specifically, the district court found that, although Carr was a drug dealer, it was unlikely he was dealing drugs out of the East Broadway residence. This finding is supported by the record. There is no evidence that Carr dealt methamphetamine or that he was a drug trafficking associate of

Barker's. The district court also noted that Barker had visited the East Broadway residence the night before the search warrant and that this secondary residence was essentially Barker's "stash house," where he conducted his drug business and likely stored his drugs and firearms. The court also found it improbable that Carr would be dealing drugs out of a house where his children were staying. On this record, the district court did not commit clear error in finding that the methamphetamine and firearms belonged to Barker or that Barker called Carr to instruct him to remove that contraband from the home.

Lastly, Barker suggests that Carr should have at least been subjected to cross-examination, given his credibility issues. But, as Barker concedes, cross-examination is not an absolute right at sentencing; instead, it is one method of establishing the indicia of reliability necessary to satisfy due process. *See Brown*, 973 F.3d at 712 ("[T]he rules of evidence and the Confrontation Clause do not apply at sentencing, and so the court may rely on hearsay even if the defendant did not have an opportunity to cross-examine witnesses."); *United States v. Sandidge*, 784 F.3d 1055, 1062 (explaining that indicia of reliability may come from various sources, including "the provision of facts and details, corroboration by or consistency with other evidence, *or* the opportunity for cross-examination" (quoting *United States v. Smith*, 674 F.3d 722, 732 (7th Cir. 2012)) (emphasis added)).

We take this opportunity to observe that, where hearsay statements could dramatically increase a defendant's guidelines range, the best practice for the district court is to order the declarant to appear and testify under oath. *See Rollerson*, 7 F.4th at 572 ("While it's not required that a judge hear

personally from witnesses under oath at a sentencing hearing about drug quantities, we think it's not a terribly bad idea to do so when the witness is going to provide the basis for … a defendant's relevant conduct." (quoting *United States v. Helding*, 948 F.3d 864, 871 (7th Cir. 2020))). Still, it is not our purview to micromanage the district court's decisions in conducting a sentencing hearing. Barker was given the opportunity to present contradictory evidence (an opportunity that he did not take), and his counsel was able to cross-examine SA Collins. In light of the strong corroborating evidence in this case, we do not believe that the district court committed clear error in managing the sentencing hearing or making the factual findings it did.

### B. Obstruction of Justice

Next, Barker contends that the record does not support the obstruction of justice sentencing enhancement under U.S.S.G. § 3C1.1. "We review *de novo* whether the factual findings of the district court adequately support the imposition of the enhancement." *United States v. Brown*, 843 F.3d 738, 742 (7th Cir. 2016). The underlying factual findings are reviewed for clear error. *Id.* at 741–42.

The obstruction of justice enhancement applies where "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. The application notes to § 3C1.1 list several examples of obstructive conduct, including "directing … another person to … conceal evidence." U.S.S.G. § 3C1.1 cmt. n.4(D). To impose this enhancement, it is enough that the defendant attempted to engage in obstructive conduct, regardless of whether that attempt was

ultimately successful. *United States v. Mikulski*, 35 F.4th 1074, 1078 (7th Cir. 2022). There is no doubt that Barker's conduct in this case was obstructive: he directed Carr to remove the methamphetamine and firearms from his home, knowing that the police might soon arrive with a search warrant.

The basis for Barker's challenge to this enhancement is unclear. He suggests that the hearsay statements were not "sufficiently reliable" or "specific enough" to warrant the enhancement. But we have already rejected the first argument, and Carr's statements adequately described Barker's obstructive conduct.

Barker also seems to challenge the district court's findings of intent. Section 3C1.1 requires "willful" obstruction, which we have interpreted to mean a specific intent to obstruct justice. *United States v. Martinez*, 650 F.3d 667, 670 (7th Cir. 2011). But "because of limitations on mind reading, willfulness usually has to be inferred from conduct rather than being determined directly." *United States v. Gonzalez*, 608 F.3d 1001, 1007 (7th Cir. 2010). Here, the district court found that Barker "expected and, in fact, probably knew" the East Broadway residence was going to be searched based on the phone conversation with his wife and that the "purpose" of Barker's call to Carr was "to get the stash out of the house." We can think of no other explanation for Barker's instructions besides an attempt to conceal evidence and hinder the impending search of his home. This is sufficient to support a finding that Barker acted willfully to obstruct justice.

## III.    CONCLUSION

For the foregoing reasons, the sentence the district court imposed is AFFIRMED.