In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 22-2573

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EDWIN AGBI, also known as
KAREEM SUNDAY,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cr-00280 — **James R. Sweeney II**, *Judge.*

_____

ARGUED SEPTEMBER 13, 2023 — DECIDED OCTOBER 18, 2023

_____

Before FLAUM, RIPPLE, and SCUDDER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* A jury convicted Edwin Agbi of one count of mail fraud, in violation of 18 U.S.C. § 1341; one count of use of a fictitious name in furtherance of mail fraud, in violation of 18 U.S.C. § 1342; one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. §§ 1341 and 1349; and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1) and 1956(h). According to the

Government's evidence, Mr. Agbi acted as a middleman in a scheme to use fake online dating accounts to solicit hundreds of thousands of dollars from unwitting elderly people. The district court sentenced him to 57 months' imprisonment. Mr. Agbi now submits that the evidence supporting each count in the indictment is legally insufficient to support a conviction. He further contends that the district court erred in employing the obstruction of justice enhancement to determine the appropriate guidelines sentencing range.

We now affirm the district court's judgment. Legally sufficient evidence supports each count of the indictment. The district court appropriately employed the obstruction of justice enhancement.

# I

# BACKGROUND

## A. Facts

Edwin Agbi, born and raised in Nigeria but a resident of the United States since 2016, became involved in a scheme with school friends in Nigeria. As part of the scheme, Mr. Agbi's friends created accounts on an online dating platform for people over the age of fifty, impersonated other individuals on that platform, and struck up online relationships with their selected victims. The friends then urged their victims to wire money and send cash, Bitcoin, and gift cards. Mr. Agbi's apartment in Indianapolis acted as a collection point for this revenue. He gave his confederates his address to use but, at least on some occasions, requested that the packages be addressed to pseudonyms such as "Kareem Sunday" or "Kareem

Monday." On multiple occasions, the victims sent packages containing cash to Mr. Agbi at his apartment, addressing the packages to the fictitious names that Mr. Agbi had suggested. When he received a package, Mr. Agbi took a "cut" and then transferred the remainder into bank accounts in Nigeria.

The Government started to uncover this scheme when it received a report of suspicious activity tied to a bank account belonging to another participant in the scheme, Angeles Palacios. Palacios had been receiving large sums of money from various individuals, including E.M., a widower tricked into thinking he was in a relationship with a non-existent "Elizabeth Stevens." Secret Service agents contacted and interviewed E.M.; in the interview, E.M. explained that he was sending money to someone he believed to be "Elizabeth Stevens" but whom he had not yet met. E.M. further told the Secret Service that he had just prepared a package containing $20,000 in cash to send to "Kareem Sunday" in Indianapolis, whom he believed was a friend of "Stevens." E.M. mailed the package, and the Secret Service intercepted it, removed the cash, and conducted a controlled delivery of the package to Mr. Agbi's home. After Mr. Agbi picked up the package, Secret Service agents confronted him and interviewed him in his home.

In the interview, Mr. Agbi admitted that he was awaiting the delivery of E.M.'s package and that he expected it to contain $20,000. But Mr. Agbi did not admit his participation in the online dating scheme. Instead, he told the agents that his friends asked him to find cars in the United States that were available for purchase and shipment to Nigeria. His friends had their "clients" send cash to Mr. Agbi so that he could purchase the cars. Every time a package arrived, however, his

friends and their "clients" changed their minds about purchasing a car and instead asked that the money be converted into Nigerian naira and deposited into Nigerian bank accounts. At the agents' request, Mr. Agbi gave them his phone.

## B. Prior Proceedings

Mr. Agbi was arrested and later charged with mail fraud, use of a fictitious name in furtherance of mail fraud, conspiracy to commit mail fraud, and conspiracy to commit money laundering. More than two and a half years after he was arrested, and with his trial scheduled in just over one month, Mr. Agbi's counsel notified the Government that Mr. Agbi intended to pursue a duress defense at trial. Mr. Agbi's counsel stated that members of the conspiracy located in Nigeria had threatened Mr. Agbi's mother and sister and that Mr. Agbi only participated in the scheme to protect his family.

The Government filed a motion in limine to preclude Mr. Agbi from pursuing the duress defense. In that motion, the Government relied on Mr. Agbi's previous failure to mention any threats (which Mr. Agbi later disputed), the absence of any references to threats in Mr. Agbi's phone, and Mr. Agbi's practice of keeping a portion of the proceeds from the deliveries (suggesting that he was a "willing participant").[1] In his response brief, Mr. Agbi described the threats and stated that his mother had filed a police report concerning the threats with the Lagos Police

---

[1] R.101 at 7–8.

Department.[2] Mr. Agbi attached the supposed police report to his brief. Reasoning that Mr. Agbi had not explained why he "lacked a reasonable opportunity to refuse to commit the offense and avoid the threatened harm," the district court granted the Government's motion.[3]

Mr. Agbi's case proceeded to a jury trial, which began on February 28, 2022, and lasted three days. At trial, two of the scheme's victims, E.M. and J.G., testified that they were deceived into believing that they were in relationships with "Elizabeth Stevens" and "Tom Champanier," respectively. E.M. sent "Stevens" "hundreds of thousands of dollars,"[4] and J.G. sent "Champanier" "around $100,000."[5] The woman whose pictures were used for "Elizabeth Stevens" testified, explaining that the pictures were posted publicly on social media but that she did not know that they were being used in that way. Michael Moore and Raina Nehring, both U.S. Secret Service agents, described the details of the controlled delivery and the subsequent interview. Agent Nehring, an expert on

---

[2] In his response brief, Mr. Agbi described the threats as follows. At some point, Mr. Agbi told a co-conspirator he wanted out of the enterprise, and in response, the co-conspirator suggested that, if Mr. Agbi left, the co-conspirator would cause harm to Mr. Agbi's family in Nigeria. Later on, when the Government confiscated the cash that E.M. sent to Mr. Agbi, the co-conspirator—who assumed at that point that Mr. Agbi had stolen the cash—visited Mr. Agbi's mother and sister at their family store, threatening violence if Mr. Agbi did not return it. Mr. Agbi's mother then filed a police report describing that incident with the Lagos Police Department.

[3] R.120 at 3; R.148 at 2.

[4] Trial Tr. I at 249.

[5] Trial Tr. II at 85.

Nigerian fraud schemes, testified that Nigerian fraudsters often refer to their victims as "clients." Mr. Agbi's alleged co-conspirators did not testify, and Mr. Agbi did not present any evidence.

The Government also played excerpts of the interview of Mr. Agbi and showed the jury WhatsApp messages from Mr. Agbi's phone. In one exchange on WhatsApp, a contact saved as "Matthew Hood" told Mr. Agbi that his client was going to block him and "get another wife."[6] Mr. Agbi responded with laughing emojis. In another exchange, a contact saved in Mr. Agbi's phone as "Germo" stated, "The client don dey my hand seens."[7] Agent Nehring testified that, in that message, "Germo is telling Agbi that the client has seen his hand, so he – – he knows that he is lying to him."[8]

On the second day of trial, the Government notified the court that its "law enforcement partners in South Africa" had contacted law enforcement authorities in Nigeria, who had said that the report was fake.[9] An email reflecting this correspondence, the Government stated, would undermine Mr. Agbi's credibility if Mr. Agbi were to testify. Ultimately, Mr. Agbi did not testify, the Government did not show the email to the court, and the court did not rule

---

[6] *Id.* at 259.

[7] *Id.* at 261.

[8] *Id.*

[9] *Id.* at 269.

on whether the Government could rely on the email for impeachment purposes.

On the third day of trial, the jury found Mr. Agbi guilty on all four counts. Mr. Agbi then filed a motion for judgment of acquittal or, in the alternative, for a new trial under Rules 29 and 33 of the Federal Rules of Criminal Procedure. He argued that the evidence was insufficient on all four of the counts, that the trial was infected with anti-Nigerian nationality bias, and that the court improperly allowed inflammatory evidence. The district court denied the motion.

The district court sentenced Mr. Agbi on August 25, 2022. The court applied a 10-level enhancement for causing a loss of between $150,000 and $200,000, *see* U.S.S.G. § 2B1.1(b)(1)(F), and a 2-level enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1. It declined to apply a "minor role" or "minimal role" reduction under U.S.S.G. § 3B1.2(b).

In support of the obstruction enhancement, the Government relied primarily on the email it had referenced at trial. In that email, dated March 1, 2022, Benjamin Chervenak, a United States Secret Service agent located in South Africa, wrote to Agent Moore: "Sorry it took so long, but Nigeria has confirmed that the documents you sent us were confirmed as fake."[10] According to Agent Moore's testimony at sentencing, Agent Chervenak "has a working relationship with the Nigerian officials."[11] The Government also relied on the "suspicious" timing of the report's disclosure. It submitted that, if the threats were real and the report was authentic, Mr. Agbi

---

[10] R.204 at 1.

[11] Sent. Tr. at 38.

would not have waited until the month before trial to bring them up. Agent Moore specifically testified that Mr. Agbi did not mention the threats in his proffer, where it would have been to his advantage to tell the Government about them.

Mr. Agbi, for his part, emphasized that the Government had not introduced any statement from the Nigerian authorities themselves regarding the report. Further, in Mr. Agbi's view, the seal at the bottom of the report indicated that the report was authentic and also that, even if it was not, he had a good faith belief that it was authentic. Mr. Agbi's wife, Jessiah Agbi, testified that she heard some of Mr. Agbi's family members describe the threats on the phone. Ms. Agbi also testified that Mr. Agbi's older brother had obtained the report from a friend of his who may have worked at the police station where Mr. Agbi's family members supposedly made the report. As for the "suspicious timing," Mr. Agbi stated through his counsel that, contrary to Agent Moore's testimony, he did tell law enforcement about the threats during his proffer session.

The district court concluded that the obstruction enhancement applied. It found credible Agent Moore's testimony that Mr. Agbi did not mention the threats at his proffer. It reasoned that "the suspiciousness of the timing of a significant defense" indicated that "it was a last-ditch effort to try to salvage something."[12] As for Ms. Agbi's testimony, the district court stressed that Ms. Agbi "does not

---

[12] Sent. Tr. at 52.

know if a report was officially made with the police station" and that "there's a lot that she does not know."[13]

Mr. Agbi's offense level and lack of criminal history yielded a guidelines range of 57–71 months' imprisonment. Concluding that "a guideline sentence is in order," the district court sentenced Mr. Agbi to a term of 57 months of imprisonment and two years of supervised release for each of the counts, to be served concurrently.[14]

## II

## DISCUSSION

Mr. Agbi challenges the sufficiency of the evidence presented on each of the four charged offenses. He also contends that the district court erred in applying the two-level obstruction of justice enhancement. We will address each of these submissions in turn.

### A. Sufficiency of the Evidence

We will overturn a conviction for insufficient evidence "only if, viewing the evidence in the light most favorable to the government, 'no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Snyder*, 71 F.4th 555, 571 (7th Cir. 2023) (quoting *United States v. Maldonado*, 893 F.3d 480, 484 (7th Cir. 2018)). Mr. Agbi has not cleared this "nearly insurmountable" hurdle on any of the four counts of his conviction. *United States v. Farmer*, 38 F.4th 591, 602 (7th Cir. 2022).

---

[13] *Id.*

[14] *Id.* at 81.

To prove mail fraud, the Government had to show "(1) a scheme to defraud, (2) use of the mails, and (3) [Mr. Agbi's] participation in the scheme with the intent to defraud." *United States v. Dingle*, 862 F.3d 607, 614 (7th Cir. 2017). Mr. Agbi contends that the Government did not present sufficient evidence that he possessed an intent to defraud. At trial, the Government presented evidence that one of Mr. Agbi's co-conspirators told him that a "client" had seen his hand (suggesting that the "client" knew he was lying). Another associate told Mr. Agbi that his "client" would need to find a new "wife."[15] The Government also showed that Mr. Agbi repeatedly requested that packages sent to him use various fake names, which he is unlikely to have done if he were working for a legitimate enterprise. *See United States v. Sloan*, 492 F.3d 884, 891 (7th Cir. 2007). The Government's evidence was more than sufficient to permit the jury to conclude that Mr. Agbi had the intent to defraud.

To prove the "use of a fictitious name in furtherance of mail fraud,"[16] the Government had to show that Mr. Agbi "use[d] or assume[d], or request[ed] to be addressed by, [a] fictitious, false, or assumed title, name, or address or name other than his own proper name" in furtherance of mail fraud. 18 U.S.C. § 1342. At trial, the jury heard a recording in which Mr. Agbi admitted to asking one of his friends to address the package the Government intercepted to "Kareem Sunday." He did so, in his own words,

---

[15] Trial Tr. II at 259.

[16] R.65.

to "play on the safer side."[17] The jury also saw messages indicating that Mr. Agbi asked to have other packages addressed to "Kareem Monday." This evidence, along with the evidence that Mr. Agbi engaged in mail fraud, easily provides legal support for Mr. Agbi's conviction on this count.

To prove conspiracy to commit mail fraud, the Government must prove "1) that the conspiracy to commit mail fraud existed; 2) that the defendant became a member of the conspiracy to commit mail fraud with an intention to further that conspiracy; and 3) that an overt act was committed by at least one conspirator in furtherance of the conspiracy to commit mail fraud." *United States v. Sims*, 329 F.3d 937, 943 (7th Cir. 2003). Mr. Agbi contends that "[t]he government did not prove that [he] knowingly became a member of the conspiracy with an intent to advance the conspiracy."[18] Mr. Agbi's extensive communications with his confederates, the prompt transfers of money into Nigerian bank accounts, and his keeping a portion of the proceeds all refute Mr. Agbi's contention.

Finally, with respect to the conspiracy to launder money, there is no question that there was sufficient evidence that Mr. Agbi agreed to participate with his confederates in a scheme to commit the offense of money laundering. "To prove the substantive offense of money laundering, the government must prove that the defendant engaged or attempted to engage in a financial transaction, knowing that the transaction involved the proceeds of specified unlawful activity, and that the defendant intended to promote the unlawful activity

---

[17] Trial Tr. II at 184–85; SA 7.

[18] Agbi Br. 18.

or knew that the transaction was designed to conceal the source, nature, location, ownership, or control of the proceeds." *United States v. Turner*, 400 F.3d 491, 496 (7th Cir. 2005).

Mr. Agbi submits that the Government failed to prove that he entered into a money laundering conspiracy with the intent to further it. But given the unusual nature of his transactions, the prompt transfers, his retention of a cut, and the other evidence indicating his knowledge of the nature of the scheme, this contention fails.

Mr. Agbi's final contention is that the Government did not show that he knew the money he received represented proceeds from unlawful activity. Here "the question is not whether [Mr. Agbi] knew the *actual* source of the funds, merely whether he knew they were the proceeds of *some* illegal activity." *Id.* at 498. The message from Mr. Agbi's friend stating that a client was going to block him and find a new "wife" (to which Mr. Agbi responded with laughing emojis), the message from another friend stating that a client had seen his hand, and Mr. Agbi's requests that the victims use the names "Kareem Sunday" and "Kareem Monday" on packages sent to his address constitute more than sufficient evidence that he knew the proceeds came from illegal activity.

## B.  Obstruction of Justice Enhancement

The Sentencing Guidelines provide for a two-level enhancement in cases in which the defendant has "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant

offense of conviction." U.S.S.G. § 3C1.1. Producing "a false, altered, or counterfeit document" during a judicial proceeding is an example of obstructive conduct. *Id.* cmt. n. 4(C). The Government bears the burden of proving that this enhancement is warranted by a preponderance of the evidence. *United States v. Burgess*, 22 F.4th 680, 686 (7th Cir. 2022).

Mr. Agbi challenges the district court's application of the obstruction enhancement on three grounds. He first contends that, "for an obstruction enhancement based on the submission of a false, altered, or counterfeit document to apply, there must be a finding that the document was false, altered, or counterfeit" and that the district court failed to make such a finding here.[19] The district court, however, did make that finding. After both sides presented evidence and arguments, the district court referred to the report as "this Nigerian fake report" and found that it was "not a correct report" and "not an official report."[20] The district court added that its ruling was based in part on discussions during trial, where it had stated, to an attorney for the Government: "I think that you have established from your South African partners . . . that it is not legitimate, that it is fake."[21]

Mr. Agbi next contends that, to the extent that the district court did find that the report was false, altered, or counterfeit, the district court's finding was erroneous. We review the

---

[19] Agbi Br. at 11, 12.

[20] Sent. Tr. at 53.

[21] Trial Tr. II at 272.

district court's finding for clear error. *United States v. Grze-gorczyk*, 800 F.3d 402, 405 (7th Cir. 2015).

The district court's finding regarding the authenticity of the report was not clear error. The main evidence in support of this finding was the email from Agent Chervenak, in which he stated that "Nigeria has confirmed that the documents you sent us were confirmed as fake."[22] Mr. Agbi's older brother, who supposedly obtained the report for him, did not testify at Mr. Agbi's sentencing and did not mention the report (or the threats) in a letter he wrote to the court for sentencing. Mr. Agbi's wife, who did testify at sentencing, did not herself file the report, did not seem to have heard of the report's filing from the family members who supposedly filed it,[23] and did not know how Mr. Agbi's brother obtained the report.[24] To be sure, Agent Chervenak's email

---

[22] R.204 at 1. Although the email from Agent Chervenak was not entered into evidence at trial or at sentencing, the district court granted the Government's motion to supplement the record, without any objection from Mr. Agbi. We can thus properly consider that email in reviewing the district court's factual findings. *See United States v. Greco*, 938 F.3d 891, 896 (7th Cir. 2019).

[23] Sent. Tr. at 41 (Counsel for Mr. Agbi: "Okay. Was a police report made – – do you know if Edwin's mother made a police report after that incident? [Jessiah Agbi]: I believe they did not officially make – – I don't know if they made it official or not, but they did go to the police station and they did talk to the police officers there, after it happened."); *id.* at 52 (The district court: "She did not know – – does not know if a report was officially made with the police station.").

[24] *Id.* at 42 (Counsel for Mr. Agbi: "Did his older brother get that report from the police station, or did his older brother create the report himself? [Jessiah Agbi]: He got it from someone. I don't know. Not himself. Q: Do you know if he got it from the police station? A: I think it was a friend

might have been more persuasive if it had contained a statement from the authorities consulted in Nigeria, *see United States v. Green*, 648 F.3d 569, 580 (7th Cir. 2011) (suggesting problems with evidence implicating "many layers of hearsay"), or an explanation of why the Nigerian authorities decided it was fake. Nevertheless, we are not "left with the definite and firm conviction that a mistake has been committed" and therefore cannot set aside the district court's finding as clearly erroneous. *United States v. Grigsby*, 692 F.3d 778, 789 (7th Cir. 2012).

Mr. Agbi also contends that the district court erred in finding that he knew that the report was false, altered, or counterfeit. "Section 3C1.1 requires 'willful' obstruction, which we have interpreted to mean a specific intent to obstruct justice." *United States v. Barker*, 80 F.4th 827, 835 (7th Cir. 2023). "But 'because of limitations on mind reading, willfulness usually has to be inferred from conduct rather than being determined directly.'" *Id.* (quoting *United States v. Gonzalez*, 608 F.3d 1001, 1007 (7th Cir. 2010). We review the district court's finding on intent for clear error. *Grzegorczyk*, 800 F.3d at 405.

Here, the Government contended—in part through testimony that the district court found credible—that Mr. Agbi suddenly disclosed the threats and report right before trial (after not mentioning it previously). It was reasonable for the district court to have inferred from Mr. Agbi's failure to mention the threats earlier that they did not occur and that raising

_____

from the police station. I don't remember. He didn't tell me that specific detail, but I know he did mention that he got it from a friend.").

them was a "last-ditch effort to try to salvage something."[25] One could draw other inferences from Mr. Agbi's silence: for instance, he may have assumed the Government would not have helped him and only realized right before trial that the threats could support a duress defense. But even if "there are two permissible views of the evidence," that would not render "the factfinder's choice between them … clearly erroneous." *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 574 (1985). The district court's finding regarding Mr. Agbi's intent was not clear error.

## Conclusion

The evidence presented at trial was legally sufficient to support all four of the counts of Mr. Agbi's conviction, and the district court did not clearly err in applying the obstruction of justice enhancement at sentencing. The judgment of the district court is affirmed.

AFFIRMED

---

[25] *Id.* at 52.